**CITIZENS FOR ALLEGAN COUNTY, INC., Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

**City of Allegan, Michigan, Consumers Power Company, Intervenors.**

**No. 21842.**

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 16, 1968.
April 29, 1969.

---

Mr. William I. Harkaway, Washington, D. C., for petitioner.

Mr. David F. Stover, Atty., Federal Power Commission, with whom Messrs. Richard A. Solomon, General Counsel, Peter H. Schiff, Solicitor, and Drexel D. Journey, Asst. General Counsel, Federal Power Commission, were on the brief, for respondent.

Mr. Howard E. Wahrenbrock, Washington, D. C., for intervenor, City of Allegan, Michigan.

Mr. George F. Bruder, with whom Messrs. Thomas M. Debevoise and Ernst Liebman, Washington, D. C., were on the brief, for intervenor, Consumers Power Company.

Before DANAHER,* WRIGHT and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

The central question on this appeal is whether petitioner was denied the hearing to which it is legally entitled by the procedure followed by the Federal Power Commission (FPC) in issuance of orders authorizing acquisition of the electric system of Allegan City Light Department and authorizing transfer of a license of the Calkins Bridge Project, a dam and power house on the Kalamazoo

* Circuit Judge Danaher became Senior Circuit Judge on January 23, 1969.

River. Petitioner is a citizens group, the Citizens for Allegan County, Inc. (Citizens). Intervenors are the acquiring company, Consumers Power Company (Consumers) and the former owner of the facility and license, the City of Allegan, Michigan (City). Although we conclude that the orders should be affirmed, the questions are not free from difficulty, and our ruling is narrowly confined to the facts and circumstances before us, to which we now turn.

Prior to 1968 the City owned and operated its electric system—consisting of generating facilities, a 2,550 kw hydroelectric plant at the Calkins Bridge Project and a 4,576 kw diesel plant, and the transmission and distribution facilities necessary to service 1,822 customers in the Allegan, Michigan, area. The City's electric system was not interconnected with any other system, and generated its own energy requirements. Early in 1966, the City began seeking an interconnection with some other electric system from which it could purchase power. After receiving proposals from Consumers and from Wolverine Electric Cooperative, the City Council decided to consider an offer by Consumers to purchase the entire system from the City. The resulting agreement, dated December 5, 1966, for the sale of the City's system to Consumers for $1,785,000, was submitted to a referendum election held January 18, 1967, which resulted in a vote—798 in favor of the sale, and 438 against—that satisfied the 60% vote requirement of the City Charter.

Applications were made to the FPC on June 9, 1967, a joint application by the City and Consumers for approval of the license transfer for the Calkins Bridge Project as required by § 8 of the Federal Power Act,[1] and an application by Consumers for approval of the merger under § 203(a) of the Act.[2]

1. 16 U.S.C. § 801 (1964).

2. 16 U.S.C. § 824b(a) (1964).

On July 12, Citizens filed a petition in opposition to the sale,[3] seeking leave to intervene as a party, with the right to produce evidence, cross-examine witnesses and be heard on brief and oral argument. This petition to intervene was answered by Consumers and the City; it was amended; and the amendment was answered by the applicants. On January 29, 1968, the FPC issued an order granting Citizens intervention, and simultaneously issued orders approving the license transfer and the merger of facilities. Citizens filed a petition for rehearing which was denied, and then petitioned this court to review the orders of the FPC.

I

■ The Citizens group was entitled to intervene and to have a meaningful opportunity for hearing in order to oppose the applications of Consumers and the City.[4] It gives us pause, then, to see that when the Commission granted intervention it simultaneously closed out the proceeding without any further presentation from the intervenor. This is indeed "disturbing"—the word used by Commissioner Ross in dissenting from this abbreviated procedure. The use of

such a procedure puts a heavy burden on the agency to demonstrate that its procedure comported with fairness and requirements of law.

■ However, the right of opportunity for hearing does not require a procedure that will be empty sound and show, signifying nothing. The precedents establish, for example, that no evidentiary hearing is required where there is no dispute on the facts and the agency proceeding involves only a question of law.[5]

An analogy is sometimes drawn from the court rules which provide summary judgment procedure for the cases that involve only legal issues and no bona fide disputed questions of fact, where it is quite clear what the truth is and there is really no issue to try.[6]

This analogy calls to mind, however, that even in court litigation there are limitations on use of summary procedure, limitations that may usefully delineate, and restrict, the appropriate use of abbreviated procedures by administrative agencies required to act after opportunity for hearing.

For example summary procedures are held to have only limited scope in anti-

---

3. Though captioned in only one docket the intervention obviously was directed to both applications.

4. Section 203(a) of the Act, 16 U.S.C. § 824b(a) (1964), provides that when the Commission is considering the grant of approval to a merger of electric facilities within its jurisdiction, the Commissioner must give notice to the state's Governor, affected state commissions, and "to such other persons as it may deem advisable. After notice and opportunity for hearing, if the Commission finds that the proposed disposition, consolidation, acquisition, or control will be consistent with the public interest, it shall approve the same."

   While there is no similar wording in the statute governing transfers of licenses, the Commission does not claim that the two dockets can be meaningfully separated for purposes of consideration of the public interest.

5. United States v. Storer Broadcasting Co., 351 U.S. 192, 202–205, 76 S.Ct. 763, 100

L.Ed. 1081 (1956); Persian Gulf Outward Freight Conference v. FMC, 126 U.S.App.D.C. 159, 164–165, 375 F.2d 335, 340–341 (1967); Virginia Elec. & Power Co. v. FPC, 351 F.2d 408, 410 (4th Cir. 1965); Producers Livestock Marketing Ass'n v. United States, 241 F.2d 192, 196 (10th Cir. 1957), aff'd sub. nom. Denver Union Stockyard Co. v. Producers Livestock Marketing Ass'n, 356 U.S. 282, 78 S.Ct. 738, 2 L.Ed.2d 771 (1958). Cf. Pikes Peak Broadcasting Co. v. FCC, U.S.App.D.C., (Nos. 22023–24 March 24, 1969); Groendyke Transport Inc. v. Davis, 406 F.2d 1158 (5th Cir., decided January 2, 1969); American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624, cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966).

6. See Rule 56 of the Federal Rules of Civil Procedure; Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944).

trust litigation. When that approach was first put forward, reference was made to the inappropriateness of summary procedures for an area of law "where motive and intent play leading roles."[7] The same principle was also applied, however, to an area not turning on intent when the Court, faced with a novel legal issue, decided it was inappropriate "to reach a conclusion on the bare bones of the documentary evidence," and determined to consider its disposition in the light of a trial developing more information as to the actual impact on competition of the arrangements under attack. White Motor Co. v. United States, 372 U.S. 253, 259, 263–264, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). Similar considerations may be pertinent when an agency is considering approval of a merger or other issues of consolidation of control.[8] These and other questions of public interest confronting an administrative agency will often be illuminated by an exploration in greater depth than can be provided simply by pleadings and documents.

The burden of justification resting on the Commission is even heavier in a case like this where the agency not only failed to notice an evidentiary hearing, but disposed of the matter without even brief or argument from the petitioner.

Yet in the particular case we affirm, not without some hesitancy, because the unique setting includes a political decision made by the City coupled with the weakness of the Citizens' allegations. We conclude that the information presented to the FPC in the applications, exhibits, affidavits, intervention petition and other pleadings, developed the salient facts of the dispute to a sufficient depth and detail that the Commission was enabled to perceive, define, and resolve the various strands of public interest. It is important that the Commis-

sion's opinion addressed itself to each of the problems raised by petitioner and set forth its reasons for concluding that the public interest lay in approval of the merger. Reviewing the Citizens' assertions as well as the setting of the case, we cannot say the Commission abused its discretion either in its conclusions or its procedure, though we in no way endorse the latter. We also feel that the matter was clearly enough presented and apprehended, and that absent some additional allegations or showing no further procedure was required.

## II

The applications of Consumers and Allegan stated, *inter alia*, that the acquisition would make possible removal of duplicate distribution facilities; that it would end the hazardous isolated status of Allegan; and that Consumers would establish a service headquarters in Allegan with 20 employees and a payroll of about $200,000 a year, the number of these employees to increase to about 40 in the future.

The issues raised by Citizens were: (1) there were irregularities in the election approving the sale; (2) the acquisition would result in increased electric rates for Allegan residents; (3) the effect of Consumers' accounting would result in increased costs; (4) the City of Allegan was overborne by Consumers Power on the deal; (5) Consumers Power earned a rate of return higher than authorized by the Michigan Public Service Commission; (6) the transfer of the hydroelectric project would harm the recreational use and water level of Lake Allegan; and (7) in both its petition to intervene and its petition for rehearing, Citizens asserted that alternative courses could be followed—there was no need to sell since ample power existed and an interconnection could be had through a

---

7. Poller v. Columbia Broadcasting System, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed. 2d 458 (1962); Levin v. Joint Comm'n on Accreditation of Hospitals, 122 U.S. App.D.C. 383, 386, 354 F.2d 515, 518 (1965).

8. *Cf.* Northern Natural Gas Co. v. FPC, 130 U.S.App.D.C. 220, 399 F.2d 953 (1968); City of Pittsburgh v. FPC, 99 U.S.App.D.C. 113, 237 F.2d 741 (1956).

purchase agreement as offered by Wolverine Electric; and if the system were sold, there should be a repurchase agreement covering the hyroelectric plant.

## A. SIGNIFICANCE OF CITY'S ELECTION AND POLITICAL DECISION

A unique feature of this case, significantly supporting the Commission's course both on the merits and procedure, is the fact that the City, through its council and its citizens on referendum, has made a political determination to increase the extent and reliability of its electric system, to entrust that responsibility to Consumers, and to get the municipality out of the electric business.

The FPC was aware that its role was not a mere "ministerial one" even though the City had made its choice. As it stated in denying rehearing:

> it is clear that we would be concerned if the proposed acquisition by a public utility would impair reliability of service or would inherently diminish the potentiality for increased service at the lowest reasonable rates, or was at so low a price as to indicate coercion by the buyer or at so high a price as to impair the financial status of the purchaser. * * * [W]e would also be concerned if there were indications that significant competition between the acquired system and the purchasing utility was being eliminated by the merger, without compensating public benefits which otherwise were not likely of achievement.

Yet the Commission correctly pointed out that the over-all balance of public interest involves not only an economic balance but also a political determination of a city council and electorate which "includes other considerations which cannot be quantified, of political and economic philosophy, management capability, governmental priority, etc."

■ There is considerable overlap in the fields of vision of the FPC and the

City. Both are concerned, for example, with the direction and extent to which the cost and rates of utility service may be changed as a result of the transfer. But there is also a difference in their focus on public interest determinations. The FPC is not interested alone in economic costs. It must consider other elements of the public interest,[9] including specifically, here, the impact on the recreational use of the lake. The City has an even broader outlook. It may properly consider benefit to other public uses having no nexus whatever to the electrical system as such—e. g., the possibility of devoting the proceeds to schools, or hospitals, etc. Cities as well as individuals may rightly decide that their over-all interests are served better by renting than buying, even though the benefits of having capital for other purposes are subject to an offset in the need to pay economic rent and profit (here a return regulated now by a state commission).

■ In this vortex of factors affecting the public interest we think the Commission was entitled, in its determination of public interest, to accord significant weight to the determination made by the city council, and electorate, if carried out with fair procedures. The City's determination was not made decisive, nor could it be. Thus the Commission must take into account the impact of the proposal on consumers who were not voters—here commercial customers. But it is appropriate to accord more latitude for summary Commission procedures where a public interest determination has been made by a city, at least where, as here, the Commission has carefully analyzed the assertions of those intervening to upset that determination and has found in these allegations significant deficiencies and inadequacies. A greater duty of inquiry in depth may be applicable in a case where the Commission was the sole official guardian of the public interest.

---

**9.** Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608 (2d Cir. 1965), cert. denied, Consolidated Edison Co. of N. Y. v. Scenic Hudson Preservation Conference, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966).

## B. REVIEW OF CITIZENS' ALLEGATIONS AND FPC's COMMENTS

It is with this framework in mind that we take up, seriatim, the assertions of Citizens, and conclude that Citizens did not allege sufficient facts, or likelihood of discovery of facts, to require reversal of either the policy determination made by the FPC or its procedure.

1. *Alleged Election Irregularities:* If, of course, petitioners could undercut the validity of election (or the city council action it asserts was overborne, see paragraph 4 below) the special factor of this case would be destroyed. However, the kind of showing necessary to undermine a vote would hardly seem to be proffered by a claim that the ballot did not properly present the "proposition" as required by the City Charter because the price was not on the ballot. *Compare* Kohler v. Tugwell, 393 U.S. 531, 89 S.Ct. 879, 21 L.Ed.2d 755 (1969).

■ The claim that Consumers charged election expenditures as operating expenses—an accounting entry easily reversible, if improper—would not invalidate the vote. Citizens also says the ads of Consumers were misleading in asserting protection of water level. The FPC set water level requirements in the license on the basis of independent studies, and future approval of the FPC is needed before Consumers Power can alter these license requirements.

■ The FPC also said it was not authorized to pass on election irregularities. While the FPC may not make a binding adjudication on them, it does not mean that the FPC cannot take them into its consideration.[10] However, there was no effort here to invoke the conventional state procedures available to challenge an election. And the asserted "irregularities" were limited in significance. We certainly are not persuaded that a hearing concerning the election was required.

2. *The Balance of Economies:* Petitioner's second point is that the higher rates to be paid by the consumers and the loss of the profits the City had made operating the electric system will not be offset, as asserted by Consumers, by the taxes now to be collected on the facilities and interest from the 1.7 million dollars. Citizens assert the sale means an annual loss, but it reaches this conclusion by looking at the cash flow of the electric system, and failing to provide deductions for depreciation reserve and interest payments. The Commission's decision did not find as fact that the sale would result in a net gain, it merely stated that Consumers had made that assertion. In denying rehearing the Commission, in its footnote 1, decried as unrealistic the accounting procedure used by Citizens. More importantly, it concluded

> Thus [because of the political determination made by the city council and voters] even if, after hearing * * * we were to determine that the financial gains to the City, as a municipal body, from selling the system were outweighed by the losses, we would not believe it appropriate to prevent the City from choosing to get out of the electric business.

> *   *   *   *   *   *

In short, we conclude that the matters over which the petitioner would have us take cognizance and with respect to which it seeks an evidentiary hearing lie peculiarly within the area where Allegan and its citizenry is entitled to make its own determination. Furthermore, even assuming the validity of the factual allegations regarding the financial gains and losses to the City, those obligations do not present a basis for concluding that the proposed acquisition is contrary to the public interest. (Bracketed material added.)

This is consistent with the position taken by the Commission in its original determination:

> The electorate of Allegan chose the somewhat higher rates of Consumers in return for what they apparently feel are adequate offsetting benefits. * * [while] we have independent responsi-

---

10. *Cf.* Pittsburgh v. FPC, *supra* note 8.

bilities to determine the appropriateness of the acquisition and are not bound by the results of the special election by the City of Allegan. * * Looking at the losses alleged by the intervenor and the benefits to the City resulting through increased tax revenue, interest on investment of the purchase price [undisputed facts], enhanced electric system reliability, and considering the entire record before us, we find that on balance the transaction is consistent with the public interest. (Bracketed material added.)

■ It is not within our province to consider whether we would have made the same determinations at the agency level.[11] Our limited role as a court of review requires us to say that we discern no facts that are in dispute, or which have not been accepted as true, that required factual hearing. Nor can we say after, considering the political determination and factors of added reliability, that the Commission was in error in its policy determination regarding the public interest.

3. *Accounting for the Acquisition Adjustment:* Citizens objected that $400,000 of an acquisition adjustment of $472,181, the amount paid in excess of the depreciated original cost of the facilities, should not be an above-the-line account as Consumers Power proposed. The FPC required that the adjustment be charged to a below-the-line account. Citizens raises no further question on this aspect of the case.

4. *The Contention that the City of Allegan Was Overborne by Consumers Power:* As with the issue of election irregularities, the significance of the political determination made by the City would be effectively undercut by any showing of coercion or undue influence. However, the facts alleged by Citizens do not suffice for this purpose. Citizens originally claimed that coercion existed in that Consumers offered the City "no reasonable choice other than to sell," and that Consumers did not offer to supply Allegan with electric energy on reasonable terms. The answering pleading attached as an exhibit a letter to the City Council from Consumers offering to sell power at the company's standard wholesale power rate. Citizens then amended its petition suggesting coercion in Consumers' refusal to furnish electric power at a "rate comparable to the offer of Wolverine Electric Cooperative." We do not see in this even a glimmer of an indication that Consumers has overborn the free choice of the City. At most it is an allegation that the general tariff structure of Consumers means higher rates to the City than Wolverine would charge.

5. *Consumers' Alleged Excessive Return:* Petitioners allege that Consumers Power is earning a rate of return higher than allowed by the Michigan Public Service Commission. The FPC, while not accepting this as a verity, stated that assuming *arguendo* its correctness, the electorate "at worst" chose to pay the higher rate for offsetting advantages, and that this fact did not alter the Commission's finding that the merger was consistent with the public interest. Citizens asserted in its amended petition to intervene that the Michigan Public Service Commission had failed effectively to regulate electric utilities due to its "inadequate budget and inadequate staff." While unfortunate, if true, the alleged failure would seem to be remediable elsewhere, and in any event it does not affect the crucial determination by the FPC.

Moreover, it may be assumed, at least *arguendo*, that a collapse in state regulatory controls that is either documented or notorious would properly be

---

11. Commissioner Ross, dissenting, felt a hearing should be had on the balance of economies, recreational benefits (discussed in paragraph 6 below), and on the terms and conditions of the § 203 decree. He was disturbed with the precedential tones of the case since intervention was permitted in the same order determining the merits.

taken into account by a federal agency in determining what is required in the public interest. *Compare* Atlantic Refining Co. v. Public Service Comm'n of State of New York, 360 U.S. 378, 388–394, 76 S.Ct. 1246, 3 L.Ed.2d 1312 (1959). But it cannot seriously be supposed that a federal agency is required to devote its staff and an evidentiary hearing to an analysis of the effectiveness of a state commission merely because some citizens recite, in terms that are general and conclusory, an objection to a city's willingness to accept the same safeguards that the state law extends generally to consumers.

6. *The Alleged Effect on Lake Allegan:* On this issue, as on point 3, it seems that the FPC has not ignored the pleas of Citizens, but has taken effective action in the circumstances. The FPC stated that both Citizens and Consumers were focusing on the wrong issue over whether on not Lake Allegan is presently suited for recreational use, for the important issue is "how can the development of the recreational potential of the Lake be best promoted and effectuated." The FPC then conditioned its approval upon Consumers' preparing a satisfactory recreational use plan. It said that petitioners need not fear improvident ultimate disposition of the project since the FPC must approve any future transfer of the license, and that under the Act and regulations, the FPC could proscribe the abandonment or sale of the licensed project without the Commission's permission. Concerning the desire of Citizens for a re-purchase agreement, the Commission felt that this would give control over disposition of project property to a non-licensee which would be improper. The Commission also conditioned the § 203 approval upon the acceptance by Consumers of the new license which included amendments protecting the lake's water level, plus conservation, recreational use and public access.

■ 7. *Alternative Courses:* Citizens argues that the FPC cannot act merely as an arbitrator between two parties, but must discharge its own duty to inquire into the relevant facts concerning the public interest, including possible alternative courses. We agree that the FPC has an active and independent duty to guard the public interest, and that this may require consideration of alternative courses, other than those suggested by the applicant.[12] This does not mean that the FPC must always undertake exhausting inquiries, probing for every possible alternative, if no viable alternatives have been suggested by the parties, or suggest themselves to the agency. We have noted that this case involves sale of an electric system by a *city*. A sale by a private party would have presented a situation devoid of a prior determination of public interest served by the sale, and would have called on the FPC to make more intensive inquiry before finding the sale consistent with the public interest. Here we have a legitimate political determination by the City of Allegan and its electors—the owners, and to a great extent the consumers of the electric power system. Their choice to stop operating the electric system limits the viable alternatives left open.

Citizens did not suggest any possibilities that had not already been rejected by the City, other than a manifestly inadequate reference to a vague and "undisclosed industrial entity" that assertedly might have been adapted to safeguard the use of the lake. In this context we cannot say that the FPC stands condemned for failure to give adequate hearing because of the possibility of alternatives.

Citizens' brief on appeal contains, in addition to assertions on the balance of

12. Udall v. FPC, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967); Northern Natural Gas Co. v. FPC, *supra* note 8; Pittsburgh v. FPC, *supra* note 8; Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608, 617–620 (2d Cir. 1965), cert. denied, Consolidated Edison Co. of N. Y. v. Scenic Hudson Preservation Conference, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966).

economies, alternatives, and misuse of the lake, various points made in rather summary fashion such as the lessening of competition, unclarity of whether and what duplicate facilities will be removed, and the fact that not all the electric consumers were voters.

■ These points are extremely bare and sketchy and they probably fall within the ambit of our prior discussion upholding the FPC's disposition. But if not, they cannot receive separate attention because they were not set forth in the petition for rehearing filed with the Commission, and hence, under section 313 of the Act, cannot be urged to this court.

### III

We revert for amplification to a point that concerns us, that the agency not only failed to notice an evidentiary hearing, but failed to accord any other opportunity for presentation of views. An agency concerned with public interest would not be opening the door to significant delays or drain of resources if it were to provide opportunity to a petitioner to file a memorandum setting forth his position (and proffer) on the issues of fact and law he deems controlling.

Light without heat may be obtained from an on-the-record conference procedure—partaking of the nature of a prehearing conference but without the notice of hearing—conducted by a member of the staff or possibly a hearing examiner. This would permit a meaningful exploration of possible public interest considerations without the rigidity and embroilment of an evidentiary hearing.

We accept the procedure followed here of shutting off the petitioner without any further presentation because we think it manifest that the document denominated petition for intervention was also, in substance, a brief and written argument. It is possible, as petitioner correctly notes, that a petition for intervention may fall far short of the presentation on the merits, facts, law or both, contemplated by the petitioner for subsequent delivery. And an intervenor should not be prejudiced merely because his petition to intervene contained some argumentation relating to the merits in order to show seriousness of purpose. But here petitioner has given no indication of any argument or presentation omitted from consideration because of the procedure followed. No proffer has been made to the agency or this court either in the form of motion for leave to file additional evidence or otherwise.

We are left with the over-all conviction that petitioner has put together a number of objections that have a theoretical predicate but are of no substantial moment in the particular case.

### IV

We stepped over certain jurisdictional matters raised by intervenor at the threshold. We reject the claim that the appeal should be dismissed for lack of showing of aggrievement. Various decisions recognize the broad principles of standing applicable to consumers of a service under regulatory control.[13] Care must be taken to avoid confusing the issue and dismissing a consumer's claim on jurisdictional grounds when the real grounds of rejection go to the merits.[14] If the Citizens-consumers had been right on the merits of their claims they would plainly have been aggrieved.

■ As for intervenor's claim that our recent decisions show lack of jurisdiction reaching back to the FPC threshold, this issue presents various difficulties, as indicated in the footnote.[15] Since such

13. Compare Joseph v. FCC, 131 U.S.App. D.C. 207, 404 F.2d 207 (1968); Office of Communication of the United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966); Bebchick v. Public Util. Comm'n, 109 U.S.App.D.C. 298, 287 F.2d 337 (1961): Pittsburgh v. FPC, *supra* note 8.

14. As for Utility Users League v. FPC, 394 F.2d 16 (7th Cir. 1968), cert. denied, 393 U.S. 953, 89 S.Ct. 377, 21 L.Ed.2d 365 (1968), cited by intervenors, we find the approach of the concurring opinion more persuasive than the majority.

15. Consumers raises the jurisdictional objection that under our ruling in Duke

difficulties may be curtailed or eliminated if the jurisdictional issue arises again, by focusing the issue and the record on the problem at the outset, we think it appropriate to invoke the doctrine under which, in appropriate cases, a court may bypass a jurisdictional issue without decision and dispose of the case by a ruling on the merits.[16]

Affirmed.

Power Co. v. FPC, 130 U.S.App.D.C. 389, 401 F.2d 930, its purchase of the City's facilities was not subject to the Commission's approval, since this was an acquisition of facilities utilized solely in the local distribution of electrical energy for retail sale.

This objection was not raised before the Commission. A question arises whether it may be presented for the first time in this court, at least for the purpose of sustaining (not attacking) a Commission order.

The brief of counsel for the Commission argues that the case is not moot since part of the facilities transferred were classed under the City's license as "primary lines," *see* § 3(11) of the Act, and with the function of transmitting energy generated at the project to the distribution system, and while the City operated in an isolated manner the acquisition by Consumers might result in a situation where these transmission lines were subject to use for interstate transmission of energy.

In this aspect of the case the jurisdictional issue may turn on factual matters that were not developed in the record as made, and hence would not be suitable for disposition on the papers as filed.

It is also noted that the proceeding before the Commis-ion involved its undisputed jurisdiction to approve transfer of the license of the hydroelectric project. The Commission might have granted permissive intervention (though denying relief) on a petition objecting solely to transfer of the license. Citizens may be entitled to use this ground to support the intervention *as granted*. If *so at least* some of the issues on the merits would be before us anyhow. Under the circumstances we have proceeded to the merits without further consideration of this jurisdictional issue.

16. *See* Pan American World Airlines v. CAB, 129 U.S.App.D.C. 159, 162, 392 F.2d 483, 486 (1968), and note 4 for cited authorities.