**PENNSYLVANIA GAS AND WATER COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

**The Manufacturers Light and Heat Company, Intervenor.**

**No. 71–1126.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 2, 1972.

Decided May 2, 1972.

Rehearing Denied May 31, 1972.

Mr. Reuben Goldberg, Washington, D. C., with whom Mr. Leo J. Steffen, Jr.,

Washington, D. C., was on the brief, for petitioner.

Mr. Thomas D. Clarke, Atty., F.P.C., of the bar of the Supreme Court of Cal., pro hac vice, by special leave of Court, with whom Messrs. Gordon Gooch, Gen. Counsel, Leo E. Forquer, Sol., and J. Richard Tiano, Asst. Sol., F.P.C., were on the brief, for respondent.

Mr. Tilford A. Jones, with whom Mr. William A. Mogel, Bethesda, Md., was on the brief, for intervenor.

Before WRIGHT, TAMM and WIL-KEY, Circuit Judges.

WILKEY, Circuit Judge:

This appeal seeks review of two orders of the Federal Power Commission. The first approved without hearing and over the objections of the petitioner, Pennsylvania Gas and Water Company, a settlement of rate proceedings; the second denied Penn Gas' application for rehearing. By order[1] of 30 October 1970 the Federal Power Commission specifically set forth Penn Gas' objections to the "Stipulation and Agreement,"[2] assumed all of Penn Gas' underlying facts to be correct, and found each objection to be without merit. By order of 31 December 1970 the FPC denied rehearing.[3]

Penn Gas' arguments before this court fall into two general categories: a claim of a denial of procedural due process by the FPC, and claims of FPC errors in four specific areas of alleged controverted factual issues. For the reasons stated hereafter, we affirm.

I. *The Procedural Due Process Issue*

In contending that it has been deprived of procedural due process by the Commission's approval of a settlement without a hearing and over its objections, Penn Gas points to the following sources in support: the Natural Gas Act,[4] which it believes entitles it to a full formal hearing; the Administrative Procedure Act;[5] the Commission's Rules[6] and practice; and judicial precedent, which it believes requires unanimous consent of the parties to settle a rate proceeding.

■ It is essential to recognize at the outset the appropriate scope for our review. The Federal Power Commission under its mandate, the Natural Gas Act, is empowered to regulate the transportation and sale of natural gas in interstate commerce for resale for ultimate public consumption. Its findings and orders, absent evidence of arbitrariness or lack of support by substantial evidence, are entitled to our respect. As we recognized in a related context:

> We are not called upon to decide directly if the [Civil Aeronautics] Board made a sound decision; judicial review calls on us to determine only if the Board followed established principles and procedures which provide the required procedural due process for the adversary parties and which should lead to a sound decision.[7]

A. *The Hearing Question*

Under the Natural Gas Act a proceeding to review a filed rate increase may be initiated by the FPC either upon com-

---

1. Order Approving Rate Settlement Upon Refund Flow Through Condition (Joint App., pp. 362–376), in The Manufacturers Light and Heat Company, et al., Docket Nos. RP69–16, et al.

2. Joint App., pp. 180–197.

3. Order Denying Application for Rehearing (Joint App., pp. 386–387), in The Manufacturers Light and Heat Company, et al., Docket Nos. RP69–16, et al.

4. 21 June 1938, c. 556, 52 Stat. 821–833, as amended, 15 U.S.C. §§ 717–717w.

5. 6 Sept. 1966, Pub.L. 89–554, 80 Stat. 381–384, 5 U.S.C. §§ 551 et seq.

6. Federal Power Commission, Rules of Practice and Procedure, 18 C.F.R. §§ 1–260.11.

7. Delta Airlines, Inc. v. CAB, 143 U.S.App. D.C. 8, 11, 442 F.2d 730, 732 (1970) (footnote omitted); see FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 62 S.Ct. 736, 86 L.Ed. 1037 (1942); cf. Moss v. CAB, 139 U.S.App.D.C. 150, 430 F.2d 891 (1970).

plaint or upon its own motion. Section 4(e) of the Act provides in relevant part:

> Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, State commission or gas distributing company, or upon its own initiative without complaint, at once, . . . to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; . . .[8]

Section 4(e) further states that the FPC, provided it orders a hearing, may suspend the rates in question in its review for a period of no longer than five months beyond the time when they would otherwise become effective. It may thereafter, by means of a refund procedure, make any order finding increased rates unjustified retroactive to the date the change became effective.

■ As the plain language of Section 4(e) and the Supreme Court's review of the Natural Gas Act in United Gas Pipe Line Co. v. Mobile Gas Service Corp. reveal, the suspension of a rate is discretionary with the Commission. Section 4(e) merely defines the power of the Commission; it *does not require* the FPC either to suspend a rate or to hold a hearing without suspension at the be-

hest of a customer such as Penn Gas.[9] As the Court remarked with respect to the Act as a whole, "In short, the Act provides no 'procedure' either for making or changing rates; it provides only for *notice* to the Commission of the rates established by natural gas companies and for *review* by the Commission of those rates."[10]

In the case at bar the FPC decided, after reviewing the evidence before it,[11] that the rates successfully negotiated by Manufacturers with all of its customers except Penn Gas, and approved by the Commission staff, did not warrant further hearing. If it were not within the power of the Commission to do so, any customer of a natural gas company could tie up its supplier and the Commission for an indefinite period in the trial of a limitless variety of issues, where there is no genuine issue of material fact, despite the ease with which their inherent worth or worthlessness might otherwise be quickly determined.

### B. *The Settlement Question*

Penn Gas asserts that it was denied procedural due process by the Commission's acceptance of the "Stipulation and Agreement" submitted by all other parties, and by the termination of the pro-

---

8. See note 4, *supra*, 15 U.S.C., at § 717c.

9. A failure by the Commission to suspend is, of course, reviewable for abuse of discretion. See Moss v. CAB, *supra*, note 7, 139 U.S.App.D.C., at 159, 430 F.2d, at 900.

10. United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 343, 76 S.Ct. 373, 380, 100 L.Ed. 373 (1956) (emphasis in original).

11. This evidence included Manufacturers' and the Home Gas Company's entire rate filings as submitted and served 27 December 1968, as well as their prepared testimony on the rate of return issue, all of which was admitted into the record at a hearing held 18 February 1969. In addition, the testimony and exhibits filed by Penn Gas, the General Services Administration and the Commission staff, and the rebuttal testimony and exhibits filed by Manufacturers and Home were copied into the record at hearings held 16 September

1969 and 2 December 1969. Penn Gas also filed on 20 February 1970 objections with the Commission to Manufacturers' and Home's motion for approval of the "Stipulation and Agreement" and for termination of the proceedings; an answer on 3 August 1970 in opposition to the Commission staff's response to its objections to the settlement agreement; and an application for rehearing, further specifying its objections on 30 November 1970.

The Commission properly took account of this evidence prior to issuance of its order of 30 October 1970, accepting the proposed "Stipulation and Agreement" as a resolution on the merits and terminating the proceedings (Joint App., pp. 362–376). As this order reveals, the Commission accepted the facts as presented by Penn Gas but found the conclusions drawn by Penn Gas to be without merit, thus dispensing with the need for a full and formal evidentiary hearing.

ceedings without further hearings. The applicable legislation, agency rules, and judicial precedents, however, favor the resolution of issues such as presented by the case at bar by settlement proposed by some or all of the litigants, subject to Commission approval.

■ It is well to note at the outset that "settlement" carries a different connotation in administrative law and practice from the meaning usually ascribed to settlement of civil actions in a court. As we shall see later,[12] in agency proceedings settlements are frequently suggested by some, but not necessarily all, of the parties; if on examination they are found equitable by the regulatory agency, then the terms of the settlement form the substance of an order binding on all the parties, even though not all are in accord as to the result. This is in effect a "summary judgment" granted on "motion" by the litigants where there is no issue of fact.

This difference in procedure between the courts and regulatory agencies stems from the different roles each is empowered to play: the court must passively await the appearance of a litigant before it; once the court's process has been invoked, the litigant is entitled to play out the contest, unless he and the other litigant reach a mutually agreed settlement or one of several summary disposition procedures is successfully invoked by his adversary. On the other hand, the regulatory agency is charged with a duty to move on its own initiative where and when it deems appropriate; it need await the appearance of no litigant nor the filing of any complaint; once the administrative process is begun it may responsibly exercise its initiative by terminating the proceedings at virtually any stage on such terms as its judgment on the evidence before it deems fair, just, and equitable,[13] provided of course the procedural requirements of the statute are observed. Only by exercising such "summary judgment" or "administrative settlement" procedures when called for can the usual interminable length of regulatory agency proceedings be brought within the bounds of reason and the agencies' competence to deal with them.

Whether the summary action of any agency in a particular case is fair, just, equitable, and in accord with the procedure required by law is a matter for judicial review, as in the case at bar. But we cannot discourage the regulatory agencies by invoking blanket prohibition against such summary "administrative settlement" procedures in all cases, particularly in view of the administrative and judicial precedents supporting such action, see *infra*.[14]

12. See notes 19–34 and accompanying text, *infra*.

13. The settlement accepted by the Commission in the case at bar, for instance, results in annual revenue reductions of approximately $1,480,450 for Manufacturers and $474,610 for the Home Gas Company, based upon operations for the 12 months ended 31 October 1970, adjusted. Commission acceptance, then, of the "Stipulation and Agreement" proposed by Manufacturers and Home and accepted by all their customers except Penn Gas was not achieved without a measure of compromise on their part.

14. Davis distinguishes between two types of hearings, a "trial" hearing and an "argument" hearing. The former, in which "parties present evidence, subject to cross-examination and rebuttal, and the tribunal makes a determination on the record," he considers to be a process for resolving issues of fact. The latter, involving the "opportunity to present evidence, to present written or oral argument or both, and to cross-examine opposing witnesses," he considers to be a means for resolving non-factual issues of law, policy, and discretion.

Trial-type hearings he considers are "never required except when facts are in dispute," citing in support, *inter alia*, Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), and Denver Union Stock Yard Co. v. Producers Livestock Marketing Ass'n, 356 U.S. 282, 78 S.Ct. 738, 2 L.Ed.2d 771 (1958). He states with respect to argument-type hearings:

When adjudicative facts are not in dispute, so that a trial type of hearing is not required, the most convenient procedure is often an oral argument, that

## 1. *The Administrative Procedure Act*

Section 554(c) of the Administrative Procedure Act provides in relevant part:

(c) The agency shall afford all interested parties opportunity for—

(1) the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment when time, the nature of the proceeding, and the public interest permit; and

(2) to the extent that the parties are unable so to determine a controversy by consent, hearing and decision on notice and in accordance with sections 556 and 557 of this title.[15]

The legislative history accompanying this provision recognizes it as being of the "greatest importance" to the functioning of the administrative process.[16] The whole purpose of the informal setttlement provision is to eliminate the need for often costly and lengthy formal hearings in those cases where the parties are able to reach a result of their own which the appropriate agency finds compatible with the public interest.

■ Section 554(c) of the Administrative Procedure Act in itself is not decisive support for the Commission action here, as the Act merely provides for the "submission and consideration of facts, arguments, offers of settlement . . . when . . . the public interest permit[s]." Except as provided in § 554 (c) (2), it does not spell out in what manner or by what procedure the Commission is to consider and *act* on the matter submitted, nor does it expressly require—or dispense with—the unanimous consent of all the participating parties in a multi-party proceeding. As we have seen above, the Commission's power to utilize summary procedures, acting on its own or the litigants' initiative to terminate the proceedings over the objection of a party, stems from the nature of its mandate as a regulatory agency, particularly under the Natural Gas Act, Section 4(e), and is amply sustained by the Commis-

---

is, a speech-making or public-meeting type of hearing. This type of hearing is very common for resolving non-factual issues of law or policy or discretion. . . .

When adjudicative facts are not at issue, so that a trial is not necessarily required, the need often is not for opportunity for hearing but is for opportunity for party participation in the determination of the governmental action. Almost any generalization about procedure is likely to be sound for some circumstances and unsound for others. Sometimes the best procedure is consultation or conferences, not open big hearings. Sometimes a detailed statement of what is contemplated, is far more effective than a public-meeting type of hearing.
K. Davis, 1 Administrative Law Treatise §§ 7.01–7.04, 7.07 (1958).

15. See note 5, *supra*, 5 U.S.C., at § 554 (c).

16. Senate Judiciary Comm., Administrative Procedure Act—Legislative History, S. Doc. No. 248, 79th Cong., 2d Sess. 203 (1945). In considering the settlement provision in S. 7, 79th Cong., 1st Sess.

(1945), which ultimately became Section 554(c) of the Administrative Procedure Act (see note 5, *supra*), the Senate Judiciary Committee stated:

Subsection (b) [now Section 554(c) of the Administrative Procedure Act] provides that, even where formal hearing and decision procedures are available to parties, the agencies and parties are authorized to undertake the informal settlement of cases in whole or in part before undertaking the more formal hearing procedure. Even courts through pretrial proceedings dispose of much of their business in that fashion. There is much more reason to do so in the administrative process, for informal procedures constitute the vast bulk of administrative adjudication and are truly the lifeblood of the Administrative process. . . . The statutory recognition of such informal methods should both strengthen the administrative arm and serve to advise private parties that they may legitimately attempt to dispose of cases at least in part through conferences, agreements, or stipulations. It should be noted that the precise nature of informal procedures is left to development by the agencies themselves.
S. Doc. No. 248, *supra*, at 24.

sion's rules, lengthy administrative practice, and judicial precedent.[17]

2. *The Commission's Rules and Practice*

Section 1.18 of the Commission's Rules of Practice and Procedure, implementing Section 554(c) of the Administrative Procedure Act, *supra,* provides:

*Section 1.18—Conferences: offers of settlement*

(a) *To adjust or settle proceedings.* In order to provide opportunity for the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment, for settlement of a proceeding, . . . conferences between the parties to the proceeding and [FPC] staff for such purposes may be held at any time prior to or during such hearings before the Commission or the officer designated to preside thereat as time, the nature of the proceeding, and the public interest may permit.

\*   \*   \*   \*   \*   \*

(e) *Offers of settlement.* Nothing contained in this section shall be construed as precluding any party to a proceeding from submitting at any time offers of settlement or proposals for adjustment to all parties and to the Commission  . . . or from requesting conferences for such purpose. . . .[18]

The Commission has made use of this settlement procedure without the consent of *all* the parties to a proceeding, including the FPC staff, in a variety of cases.[19]

In *Union Oil Co. of California, et al.,*[20] the Commission accepted an offer of settlement finding it "to be in the public interest," and terminated the proceedings despite the fact that the FPC staff and

---

17. As to any requirement of unanimity, see notes 13–14 and accompanying text, *supra,* and notes 19–34 and accompanying text, *infra.* The Attorney General's Manual on the Administrative Procedure Act states that the purpose of the settlement provision " . . . is to provide, so far as practicable, for the informal settlement or adjustment of controversies in lieu of formal adjudicatory proceedings." U.S. Dep't of Justice, The Attorney General's Manual on the Administrative Procedure Act, 48 (1947).

The opportunity to settle a controversy has been held to exist while a hearing is underway. When a party to a proceeding before the National Labor Relations Board asserted that the NLRB failed to afford the parties an opportunity to adjust and settle their differences and thus violated the Administrative Procedure Act, the Fifth Circuit held the Act was satisfied on this point by the Trial Examiner recessing the proceeding to allow the parties such an opportunity. NLRB v. East Texas Steel Castings Co., 5 Cir., 211 F.2d 813 (1954).

18. See note 6, *supra,* at Section 1.18, Subchapter A, Part 1.

19. These include Petroleum Leaseholds, Inc., et al., 21 F.P.C. 799 (1959), in which the Commission approved a proposed settlement of a rate increase dispute in spite of the opposition of the FPC's own staff, which considered that insufficient evidence had been submitted for the Commission to find that the suspended rates were fair and lawful.

Similarly, in Charles H. Osmond, et al., 22 F.P.C. 68 (1959), the Commission issued an order approving a proposed "Offer of Settlement" over the objections advanced by the FPC staff of insufficient evidence in the record to support a finding that the suspended rates were "just, reasonable and lawful." The FPC found "[t]he proposed Offer of Settlement would be beneficial to the public and advantageous to all concerned, by relieving the Commission, the producers, and Texas Eastern, as well as customer companies [none of whom had intervened in opposition to the proposed settlement], of the time and expense which might be necessary to the conduct of formal hearings in such rate cases. . . ." The Commission also found that the settlement would produce "welcome" rate stability and would free it to concentrate on "more important rate cases and other matters having possibly more serious consequences for the public and the consumer." 22 F.P.C., at 69.

20. 23 F.P.C. 73 (1960). The Commission admonished the nonsignatories as follows: We should note, however, that the non-signing intervenors have been fully advised of the terms of the offer settlement and given every opportunity to present any objections to its acceptance. Although they have been well aware of the importance of disposing of

several of the intervenors failed to sign the settlement agreement.

*Hunt Oil Co., et al.*[21] and *Texaco, Inc., et al.*[22] both involved Commission approval, conditional in the former, final in the latter, of rate settlement proposals, termination of proceedings and prescription of refunds. Several customers intervened and filed unfavorable comments. In each case, after modifying the settlement offer as initially proffered, the Commission found each proposal met "the criteria previously set forth in other of our recent settlement orders and accordingly . . . find [each] to be in the public interest. . . ."[23]

In *Socony Mobil Oil Co., et al.,* the Commission approved a rate settlement proposal, terminated the proceedings and prescribed refunds, all over the objections of an intervenor-customer.[24] The Commission stated that "[t]he principles underlying the present settlement are consistent with those utilized in previous major independent producer rate settlements," that "[t]he rates herein agreed upon are consistent with the guidelines set forth in our Statement of General Policy No. 61–1, as amended," and that

"[r]efund dates are determined by utilizing cost of service studies prepared in accordance with prior Commission decisions."[25] The FPC thus found the proposed settlement in *Socony Mobil* to be "in the public interest."

*Atlantic Seaboard Corp., et al.* involved conditional Commission approval of a rate settlement agreement and prescription of refunds. All but two of the parties participating in the informal conferences supported the proposed settlement. The Commission, after considering the objections advanced by these two parties, found "no basis in [the first party's] comments which would warrant disapproval of the proposed settlement" and that "the facts are contrary" to the objections, which it labeled "without merit," presented by the second party.[26]

### 3. *Judicial Precedents*

This court, in remanding a case to the FPC in which the Commission had refused to consider a proposed settlement because of objections by a principal party to the proceeding, held that once such offers are made, the Commission *"cannot refuse to consider* a proposal which appears, on its face at least consistent with

the controversy, the intervenors who have not signed the settlement agreement have not called to our attention any considerations which in their view would tend to weigh against acceptance. We do not mean by this, of course, to shift our responsibility, but, nevertheless, we are of the opinion that valid objections should be timely considered. 23 F.P.C., at 75.

21. 30 F.P.C. 220 (1963).

22. 30 F.P.C. 1631 (1963).

23. 30 F.P.C., at 1635. The Commission was careful to note, however, that "Certainly, neither PSC [an intervenor] by being a 'silent bystander' in past settlement negotiations, whether they are successful or not, nor may [sic] any other party or participant, can be said to have agreed or disagreed to any principle or method involved in attempting to reach agreement. Nor do settlements prevent parties in other proceedings from arguing their positions as to the legal effect of

settlements on the rates in such other proceedings." *Id.*

24. 31 F.P.C. 1101 (1964). The intervenor-customer had asserted, in the FPC's words:

> [A] meaningful evaluation of the amounts [by which Socony's rates would be reduced and of the refunds] cannot be made without knowledge of the amount of monies collected subject to refund and retained under the settlement, and the annual amount of rate increases which will be effected under the settlement. Further, PSC [the intervenor-customer] states that its past acquiescence in rate settlements "is necessarily premised upon our reliance on the scrutiny which such settlements receive from the Commission and its staff," and that it believes such scrutiny should not be hampered by the lack of information it cites.

31 F.P.C., at 1104.

25. *Id.,* at 1104.

26. 37 F.P.C. 244, at 247–248 (1967).

[its] duty [of protecting the ultimate consumer]."[27] We explained:

> Even assuming that under the Commission's rules Panhandle's rejection of the settlement rendered the proposal ineffective *as a settlement*, it could not, and we believe should not, have precluded the Commission from considering the proposal *on its merits*. Indeed, the proposal appears prima facie to have merit enough to have required the Commission at some stage of the proceeding to consider it on its own initiative as an alternative to total abandonment.[28]

Carrying this one step further, the Fourth Circuit in Cities of Lexington, etc. Ky. v. FPC[29] held that where there was no genuine issue of material fact the Commission could approve a proposed settlement of a rate proceeding as a resolution on the merits with less than unanimous consent of the parties involved. The court stated:

> There is nothing in the Administrative Procedure Act which expressly requires unanimous consent of all the participating parties to an agreement of settlement; and to read such a contention into the statute in view of the countless state agencies, municipalities, and consumers who may be interested in an administrative proceeding would effectually destroy the settlement provision. In this instance the kind of interest which Lynchburg [a petitioner there] entered the proceeding to represent was protected by the participation and consent of other parties in like situation. Their consent to the settlement was sufficient basis for the Commission's approval.[30]

The petitioner Lynchburg had contended that the FPC could not accept the proposed settlement over Lynchburg's objection and was required instead to hold a formal hearing. Lynchburg relied on Minneapolis Gas Co. v. FPC,[31] in which this court had stated that "the Commission cannot terminate a proceeding after it has actually conducted a hearing to the point of receiving an Examiner's initial decision, without rendering a decision upon the issues presented, which is the lawfulness of the proposed rates."[32] This court was careful to point out, however, that "We do not have before us, and therefore do not decide, whether the Commission may terminate a proceeding, once entered upon, at some point prior to the conclusion of the evidentiary hearing. A change of mind, midstream so to speak, may or may not be permissible.[33] This court in a subsequent case further stated:

> . . . [S]everal cases subsequent to Minneapolis Gas, though recognizing the principle of that case, point out that an agency determination to discontinue proceedings will not be upset where there is good reason therefor.[34]

*Cities of Lexington, supra,* then stands for the proposition that an offer of settlement may be accepted by the Commission as a resolution of a rate proceeding on the merits with less than unanimous consent of those participating, and the proceeding terminated without a full and

---

27. Michigan Consolidated Gas Co. v. FPC, 108 U.S.App.D.C. 409, 429, 283 F.2d 204, 224, cert. denied sub nom. Panhandle Eastern Pipe Line Co. v. Michigan Consolidated Gas Co., 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227 (1960) (emphasis in original).

28. *Id.*

29. 295 F.2d 109 (4 Cir., 1961).

30. *Id.,* at 121 (emphasis supplied).

31. 111 U.S.App.D.C. 16, 294 F.2d 212 (1961).

32. *Id.,* 111 U.S.App.D.C. at 19, 294 F.2d, at 215.

33. *Id.*

34. Brandenfels v. Day, 114 U.S.App.D.C. 374, 378–379, 316 F.2d 375, 379–380, cert. denied, 375 U.S. 824, 84 S.Ct. 66, 11 L.Ed.2d 57 (1963), citing Eastern Airlines, Inc. v. CAB, 111 U.S.App.D.C. 39, 41, 294 F.2d 235, 237, cert. denied, 368 U.S. 927, 82 S.Ct. 363, 7 L.Ed.2d 191 (1961); State of Wisconsin v. FPC, 112 U.S.App.D.C. 369, 375, 303 F.2d 380, 386, aff'd sub nom. Wisconsin v. FPC, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963); Cities of Lexington, etc. Ky. v. FPC, 295 F.2d 109, 119–122 (4th Cir. 1961).

formal evidentiary hearing, provided, of course, there is no dispute of fact.

■ Penn Gas attempts initially to distinguish *Cities of Lexington* from the case at bar by asserting that controverted issues of fact in the instant case preclude FPC acceptance of the "Stipulation and Agreement" proposed as a resolution on the merits. In the event no factual controversy exists here, however, no hearing is required.[35] In the case at bar, we find no possible dispute over the facts, since the Commission accepted all of Penn Gas' *factual* allegations as correct.[36]

Furthermore, it is apparent that Penn Gas has been afforded ample opportunity to present its position to the Commission from its participation in both the pre-hearing and informal conferences, its objections to the proposed "Stipulation and Agreement" filed with the Commission,[37] and its objections to the FPC's first order in its application for rehearing.[38] The Commission dealt with these objections in detail in its order approving the proposed "Stipulation and Agreement," explaining its grounds for rejecting them.[39] As this court noted in *Citizens for Allegan County, Inc.*:

> We conclude that the information presented to the FPC in the applications, exhibits, affidavits, intervention petitions and other pleadings, developed the salient facts of the dispute to a sufficient depth and detail that the Commission was enabled to perceive, define, and resolve the various strands of public interest. It is important that the Commission's opinion addressed itself to each of the problems raised by petitioner and set forth its reasons for concluding that the public interest lay in [rejecting them].[40]

If the Commission were required in a case such as this one to hold a full and formal evidentiary hearing despite the fact that it accepted all of a participant's factual allegations as true and still found their conclusions to be wanting, the settlement procedure would be rendered meaningless. As the Fourth Circuit recognized in *Cities of Lexington, supra*:

> In view of the great volume of the Commission's business and the intricacies of utility accounting practices suspension of a new schedule proposing increased rates is almost a matter of course; and it goes without saying that there is no substance to the suggestion that if the Commission at the time of suspension announces that a hearing will be held the hearing must be held no matter how futile or unnecessary it thereafter becomes by reason of a settlement.[41]

In dealing with its increasingly heavy case load, the importance of the settlement provision to the Commission is evident from the fact that during fiscal year 1970 no less than 59 pipeline companies requested rate increases, as compared with 35 the prior fiscal year. Of these, only 10 were disposed of during fiscal year 1970, *eight* of them by settlement.[42]

Penn Gas also seeks to distinguish the instant case from *Cities of Lexington, supra,* in which no formal hearing was held but simply informal conferences, by

---

35. As this court noted in Citizens for Allegan County, Inc. v. FPC, 134 U.S.App. D.C. 229, 232, 414 F.2d 1125, 1128 (1969) (footnote omitted):

. . . [T]he right of opportunity for hearing does not require a procedure that will be empty sound and show, signifying nothing. The precedents establish, for example, that no evidentiary hearing is required where there is no dispute on the facts and the agency proceeding involves only a question of law.

36. See *infra* and Joint App., p. 367.

37. See Joint App., pp. 355–361.

38. See *id.,* at 377–385.

39. See *id.,* at 367–374.

40. Citizens for Allegan County, Inc. v. FPC, note 35, *supra,* 134 U.S.App.D.C., at 233, 414 F.2d, at 1129.

41. Cities of Lexington, etc. Ky. v. FPC, note 29, *supra,* 295 F.2d, at 121.

42. Federal Power Commission, 1970 Annual Report to Congress, 62.

pointing out that in the case at bar a formal hearing was convened and evidence copied into the record. To conclude, therefore, that the Commission is irrevocably bound to continue with a full and formal evidentiary hearing is unwarranted in view of Section 554(c) of the Administrative Procedure Act,[43] Section 1.18 of the FPC's Rules of Practice and Procedure,[44] and this court's ruling in Michigan Consolidated Gas Co. v. FPC.[45]

## II. *Penn Gas' Specific Objections*

■ Penn Gas identifies four specific areas as containing controverted issues of fact, and asserts that with respect to each the Commission could not possibly have assumed the underlying facts as presented by Penn Gas to be correct. On this basis, it urges that a full and formal evidentiary hearing is required. We believe that in each instance Penn Gas confuses contrary conclusions which might be drawn from accepted basic facts with contradictions in the basic facts themselves. We find no conflict in fundamental facts calling for a hearing; we do find that the FPC has placed interpretations on and drawn conclusions from the facts which differ from those urged by Penn Gas, and that the Commission's expertise entitled it to do so, and that it has done so reasonably.

## A. *Delivery Points*

Penn Gas claims that it suffers unlawful rate discrimination in that it receives natural gas from Manufacturers at only one delivery point, in contrast to larger customers who receive gas at numerous points, thus requiring Penn Gas to bear the cost differential of serving a number of points.[46]

■ In the first place, simply showing a higher cost, which the Commission accepts as true with respect to Manufacturers' larger customers, does not conclude the investigation of whether a rate is unduly discriminatory to smaller customers such as Penn Gas. The higher cost may be offset by other considerations. And the burden of establishing that system-wide rates are unlawful in that they discriminate unduly against smaller consumers rests with Penn Gas.

The FPC, despite the admitted difference in cost, has rejected the allocation of costs by delivery points. "[A]ny attempt to arrive at such perfection would be not only delusory, but also impracticable and infeasible from both the management and regulatory point of view."[47] The Supreme Court has stated, ". . . where as here several classes of service have a common use of the same property difficulties of separation are obvious. Allocation of costs is not a matter for

---

43. See notes 5 and 16, *supra*.

44. See text at note 18, *supra*.

45. As this court stated in Michigan Consolidated Gas Co. v. FPC, note 27, *supra*:
    Of course, there may be valid objections to the settlement proposal which the Commission has not explained, or which a hearing upon the proposal would reveal. Such considerations may merit modification or total rejection of the proposal. But we think that, since the Commission is charged with the duty of protecting the ultimate consumer from "exploitation at the hands of natural gas companies," Federal Power Comm. v. Hope Natural Gas, 1944, 320 U.S. 591, 610, 64 S.Ct. 281, 88 L.Ed. 333, . . . it cannot refuse *to consider* a proposal which appears, on its face at least, consistent with that duty.
    108 U.S.App.D.C., at 429, 283 F.2d, at 224 (emphasis in original).

46. As the FPC points out, all of Manufacturers' customers, not only Penn Gas, are affected by the impact on Manufacturers' rates of the alleged controverted issues in the case at bar: zoning, the pricing of exchange gas, delivery points, and the tax savings resulting from filing a consolidated return. While Penn Gas compares itself with 3 delivery points to Columbia Gas of Pennsylvania with 232 (Brief for Petitioner, p. 29), Exhibit No. P–37, Schedule No. 3 (Joint App., p. 208) of Penn Gas' witness Benson demonstrates that six of Manufacturers' customers listed therein received gas at 5 or fewer delivery points. Furthermore, the second largest customer in terms of delivery points is the Ohio Valley Gas Company with 40 (Brief for Respondent Federal Power Commission, p. 21).

47. Northern Natural Gas Co., 14 F.P.C. 11, 24 (1955).

the slide-rule. It involves judgment on a myriad of facts." [48] And this kind of judgment is particularly appropriate for the FPC to make.

The Commission rejected Penn Gas' claim of unlawful discrimination, pointing from among "a myriad of facts" to the benefits Penn Gas gained from the higher load factor purchase of gas by Manufacturers from Transcontinental Gas Pipe Line Corporation for Penn Gas' account; the ability of Manufacturers to use valley gas resulting from such purchase; Manufacturers' larger customers, whose service needs allow it to make service available to, *inter alia,* Penn Gas; and the fact that storage fields serve the entire system, either directly or by displacement.

### B. *Rate Zoning*

■■ While the Commission accepted Penn Gas' view of the underlying facts as accurate in regard to rate zoning (*i. e.,* that Manufacturers' system extends from West Virginia to the Pennsylvania-New York state line; that Manufacturers' underground storage projects are located in the western part of its system; and that Manufacturers purchases natural gas from a number of companies at different points along its system), it did not, nor was it required to, accept Penn Gas' *opinion* that as a result of these facts alone Manufacturers' rates should be zoned between two broad geographical areas. Looking to the conclusions submitted by Manufacturers and by the FPC staff, not prohibited in light of the fact that it was passing on the merits of the proposed "Stipulation and Agreement," [49] the Commission decided that it was not feasible to zone Manufacturers' system:

Penn Gas . . . ignores that the flow of gas on Manufacturers' system is in a "grid" pattern, *i. e.,* gas flows in many directions and in different

---

48. Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 589, 65 S.Ct. 829, 89 L.Ed. 1206 (1945).

49. The Commission may reply on its own expertise in such matters. See Market Street Ry. Co. v. Railroad Commission of California, 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171 (1945), in which the Court, *inter alia,* in response to the assertion that the Commission's order requiring the street railway company to reduce its base cash fare from seven to six cents was invalid in the absence of expert testimony from the record, stated:

Experts' judgments, however, would not bind the Commission. Their testimony would be in the nature of argument or opinion, and the weight to be given it would depend upon the commission's estimate of the reasonableness of their conclusions and the force of their reasoning. There is nothing to indicate that any consideration which could be advanced by an expert has not been advanced by the Company in argument and fully weighed.

324 U.S., at 560, 65 S.Ct. at 777. See also Interstate Power Co. v. FPC, 236 F.2d 372 (8th Cir.), cert. denied, 352 U.S. 967, 77 S.Ct. 352, 1 L.Ed.2d 321 (1957), and South Carolina Generating Co. v. FPC, 249 F.2d 755 (4th Cir.), cert. denied, 356 U.S. 912, 78 S.Ct. 668, 2 L.Ed.2d 585 (1958). In the latter case, the court held an FPC order fixing a return rate valid despite the absence (in contrast to the case at bar) of expert testimony, in light of the Commission's expertise and support of substantial evidence. The court did, however, remand the case for further consideration on other grounds.

In Interstate Power Co. v. FPC, involving an order of the Commission finding the use of system-wide rates by a particular company unduly discriminatory and ordering it to divide its system into zones, the court stated:

The Commission is "one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess." . . . It has been delegated by the Congress to administer the Natural Gas Act with power "to draw inferences from [the facts]." Its "function is not only to appraise the facts and to draw inferences from them but also to bring to bear upon the problem an expert judgment." . . . [A]nd particularly its findings and directives need not be based directly on the expressed opinion of experts, but may be drawn from the facts.

236 F.2d, at 385 (citations omitted).

directions at different times. Five pipeline suppliers deliver gas into Manufacturers' system at 14 points surrounding the market area, and a large portion of such deliveries are into storage fields which serve the entire system, either directly or by displacement. Thus, there is no basis for Penn Gas' zoning proposal.[50]

Such a determination clearly lies within the Commission's discretion.

### C. *Pricing of Exchange Gas*

The Commission accepted Penn Gas' view of the underlying facts: that the exchange rate has an impact on Manufacturers' cost of service and therefore on the fairness of the rates in the proposed "Stipulation and Agreement"; that if the gas exchanged was priced at the rates set forth in Manufacturers' Rate Schedule CDS and WS,[51] such higher pricing would also reduce the cost of service to Manufacturers' other customers; and that the value of winter gas deliveries by Manufacturers to the Cumberland and Allegheny Gas Company may be higher than the value of the summer gas deliveries which Manufacturers receives from them.

The FPC refused, however, to accept the *opinion* of Penn Gas' witness that this pricing was unduly discriminatory, since this witness (Benson) used both the Cumberland and Allegheny requirements from Manufacturers and the amount of gas available from Cumberland and Allegheny for Manufacturers based on the design peak day.[52] The Commission found:

> The method utilized by Penn Gas' witness is inappropriate since it includes the net imbalance volumes rather than being based on total annual deliveries. Penn Gas' approach is tantamount to billing on the basis of a hy-

pothetical load factor of 21 percent in contrast to the actual load factor of 38 percent.[53]

As such, the Commission properly relied upon its own expertise in regard to the selection of volumes to be used and the proposed rates to be applied to these volumes.[54]

### D. *Federal Income Tax Allowance*

While the Commission accepted Penn Gas' view that Manufacturers' joint filing of its tax return with the Columbia Gas System produced a saving, there exists a factual controversy as to the precise percentage of this saving. However, as the Commission indicates, Penn Gas did not file its own testimony on this matter but relied instead on the FPC staff's testimony.

Prior to the Commission's issuance of the first order in the case at bar, accepting the proposed "Stipulation and Agreement," Manufacturers and the FPC's staff had disagreed as to the precise tax saving percentage, but then reached agreement on the figure of five percent. Before accepting this figure as a resolution of this question on the merits, the Commission indicated that it had considered Penn Gas' objections to this five percent figure, but found them wanting in view of its treatment of objections identical in substance advanced initially by the FPC staff in *Columbia Gulf Transmission Co., et al.*[55] The Commission had there denied such objections.

The FPC stated in the case at bar that it could "see no reason to alter the treatment of these issues here from that in *Columbia Gulf*, an upstream affiliate of Manufacturers and [the] Home [Gas Company]."[56] The Commission had found over the course of a test period in *Columbia Gulf* that a five percent tax saving was a "reasonable compromise."

50. Joint App., pp. 370–371.
51. *Id.*, at 193.
52. See Exhibit No. P–37, Schedule No. 5 (Joint App., p. 209).
53. Joint App., p. 367.
54. See note 49, *supra.*
55. 43 F.P.C. 974 (1970).
56. Joint App., p. 372.

### III. *Conclusion*

■ Accordingly, the orders of the Commission of 30 October 1970, approving the "Stipulation and Agreement" as a resolution on the merits over the objections of Penn Gas and terminating the procedings, and of 31 December 1970, denying Penn Gas' petition for rehearing, are

Affirmed.