853 F.2d 958
 272 U.S.App.D.C. 27
 PETCHEM, INC., d/b/a Petchem, Inc. of Connecticut, Petitioner,
v.
FEDERAL MARITIME COMMISSION and the United States of
America, Respondents,
Canaveral Port Authority, et al., Intervenors.
 No. 86-1288.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 29, 1987.
Decided Aug. 9, 1988.
 
 Warner W. Gardner, with whom Robert T. Basseches and Timothy K. Shuba, Washington, D.C., were on the brief, for intervenors Canaveral Port Authority, et al.
 J. Michael Cavanaugh, Stuart S. Dye, and David C. Nolan, for Carnival Cruise Lines, Inc.; Forest A. Hainline, III, and Timothy A. Ngau for Royal Caribbean Cruise Line, Inc.; Edward P. Henneberry for Holland America Line-Westours, Inc.; Pierre J. LaForce and Christine V. Simpson for Ocean Cruise Lines, Inc.; and Jeffrey S. Davidson for Cunard Line, Ltd. were on the brief for amici curiae Cruise Lines and Cruise Lines Intern. Ass'n, urging affirmance.
 Paul C. Warnke and John G. Calendar, Washington, D.C., were on the brief for amicus curiae American Ass'n of Cruise Passengers.
 C. Jonathan Benner, with whom Charles L. Coleman, III, San Francisco, Cal., and Jonathan W. Cuneo, Washington, D.C., were on the brief, for petitioner.
 John C. Cunningham, Atty., Federal Maritime Com'n, with whom Robert D. Bourgoin, Gen. Counsel, Federal Maritime Com'n, Catherine G. O'Sullivan, and Robert J. Wiggers, Washington, D.C., Attys., U.S. Dept. of Justice, were on the brief, for respondents.
 Before BUCKLEY and WILLIAMS, Circuit Judges, and LOUIS F. OBERDORFER,* United States District Judge for the District of Columbia.
 Opinion for the court filed by Circuit Judge BUCKLEY.
 BUCKLEY, Circuit Judge:
 
 
 1
 Petchem, Inc. applied for a nonexclusive franchise to provide tugboat services for commercial vessels at Port Canaveral. At the time, Hvide Shipping, Inc. held an exclusive franchise from the Canaveral Port Authority to provide those services. The Port Authority denied Petchem's application. Petchem filed a complaint with the Federal Maritime Commission, which ultimately found that the Port Authority had not unreasonably concluded that the grant of the requested franchise would jeopardize the Port's ability to meet the needs of commercial shipping. We do not decide intervenors' challenge to the Commission's jurisdiction over the tugboat franchise issue, but we deny Petchem's petition for review on the merits.
 
 I. BACKGROUND
 A. Port Canaveral
 
 2
 The Canaveral Port Authority ("CPA" or "Port Authority") is an agency of the State of Florida charged with the construction and operation of a deep-water port at Cape Canaveral. The Port Authority has been endowed with broad authority over Port Canaveral and its operations, including authority to exercise police and tax powers, franchise services, and own and operate terminal and other facilities. See Chapter 28922, 1953 Laws of Florida 268; as amended, Joint Appendix ("J.A.") at 926-51.
 
 
 3
 The Port itself consists of three adjacent basins and a dredged channel connecting the basins to the Intercoastal Waterway. The eastern basin and a majority of the land surrounding the middle basin is owned by the United States and used by the military and the National Aeronautics and Space Administration. The CPA exercises overall jurisdiction over the Port and owns and operates its commercial facilities, including warehouses, terminals for passenger cruise ships, and berths for tankers, barges, and commercial cargo ships.
 
 
 4
 The United States contracts for towing services in its part of the Port. From 1958 to 1983, these were provided by subsidiaries of intervenor Hvide Shipping, Inc. (collectively "Hvide"). Hvide's military contract allowed it to provide towing services to commercial vessels. Although, in 1983, Hvide became ineligible to bid for a renewal of the military towing contract because its revenues exceeded a Small Business Administration ceiling, it continued to serve as the sole provider of commercial tug and towing services under a franchise agreement with the CPA. The present agreement, J.A. at 722-25, provides that the Port Authority may not grant a franchise to any other commercial tug towing service without first holding a public hearing and determining that "convenience and necessity" so require.
 
 
 5
 In 1983, after Hvide had been found ineligible for a renewal, the military awarded its Port Canaveral tugboat business to Petchem. Prior to that time, Petchem had had no tugboat experience. In December 1983, before beginning work under its military contract, Petchem applied to the Port Authority for a non-exclusive franchise to provide commercial tug and towing services as well. The CPA appointed a committee to study the matter, and pursuant to the terms of its franchise agreement with Hvide, the Port Authority held a hearing in February 1984 at which it accepted its committee's recommendation that the Petchem application be denied. J.A. at 726-40.
 
 B. Proceedings Before the FMC
 
 6
 Petchem filed a complaint with the Federal Maritime Commission ("FMC" or "Commission") alleging that the CPA's denial of its application constituted an "unreasonable practice" in violation of section 17 of the Shipping Act of 1916, 46 U.S.C. app. Sec. 816 (1982 & Supp. I 1983) ("1916 Act"), as well as "undue prejudice" against Petchem and an "unreasonable preference" in favor of Hvide in violation of section 16 of the 1916 Act. 46 U.S.C. app. Sec. 815 (1982 & Supp. I 1983). J.A. at 99. While these proceedings were pending before the Commission, Congress enacted the Shipping Act of 1984 ("1984 Act"), which contained provisions similar to those in the 1916 Act. In later pleadings and filings, Petchem broadened the scope of its complaint to include allegations of violations of sections 10(b)(11)-(12) and 10(d)(1) of the 1984 Act, 46 U.S.C. app. Sec. 1709(b) & (d) (Supp. II 1984). Thus the FMC's inquiry addressed both Petchem's qualifications for a non-exclusive franchise and the propriety of the CPA's franchise policy under the two Acts.
 
 
 7
 An administrative law judge ("ALJ") initially heard the case. Following discovery and public hearings, the ALJ concluded that the Commission had jurisdiction over the dispute and that Petchem had standing to challenge the denial of the franchise before the FMC. On the merits, the ALJ determined that the Port Authority had violated the 1916 and 1984 Acts (collectively "the Shipping Acts"). Petchem, Inc. v. Canaveral Port Auth., 23 Shipping Reg. (P & F) 480 (1985) ("ALJ Op."). Relying on the Commission's ruling in A.P. St. Philip, Inc. v. Atlantic Land & Improvement Co., 13 F.M.C. 166 (1969) ("St. Philip "), the ALJ decided that Petchem's proof of an exclusive franchise arrangement had established a prima facie case of a violation of the Shipping Acts, thereby shifting the burden of justifying the arrangement as just, reasonable, and non-prejudicial to the Port Authority, which failed to meet it.
 
 
 8
 The ALJ concluded that the franchise constituted "unjust prejudice" not only against Petchem but also against any other commercial tug operator interested in serving the Cape Canaveral market. He also held that the CPA's denial of Petchem's application under "a vague test of convenience and necessity" was unreasonable. ALJ Op., 23 Shipping Reg. (P & F) at 499. The CPA and Hvide filed exceptions to the ALJ's decision.
 
 
 9
 The FMC upheld the ALJ's findings of jurisdiction but reversed on the merits. Petchem, Inc. v. Canaveral Port Auth., FMC No. 84-28, 23 Shipping Reg. (P & F) 974 (1986) ("FMC Op."). The Commission agreed that it had jurisdiction on several grounds: the CPA provided "terminal facilities" to passenger cruise lines that engaged in "common carriage" as defined by the Shipping Acts, id. at 981-83; various provisions of the Shipping Acts "plainly include carriers of passengers," or "clearly protect passengers" by prohibiting preferential or prejudicial treatment of any person, or "can be read to protect the property of passengers," id. at 984; and the franchising of tug towing service constitutes the provision of terminal facilities, id. at 986-87 (citing St. Philip ).
 
 
 10
 In a concurring opinion, Commissioner Thomas F. Moakley expressed a contrary view. He argued that "[i]t does not follow from the fact that the respondent Canaveral Port Authority is a marine terminal operator that all of its activities are, therefore, subject to regulation under the Shipping Act of 1984." Id. at 995 (footnotes omitted). He noted that in Bethlehem Steel Corp. v. Indiana Port Commission, 21 F.M.C. 629 (1979), the Commission had drawn a distinction between navigational and terminal services, and that this distinction between port functions resulted in "a proper narrowing of the broad language of the St. Philip case," and concluded that "[t]ug services fall neatly on the navigational side of such a dividing line and outside the scope of terminal services." Id. at 996 (footnote omitted).
 
 
 11
 On the merits, the Commission reversed the ALJ and upheld the Port Authority's action denying Petchem's application for a nonexclusive franchise. The Commission noted that in St. Philip and California Stevedore & Ballast Co. v. Stockton Port Dist., 7 F.M.C. 75 (1962) ("Stockton Port "), it had found exclusive arrangements for tugging and stevedoring services to be "prima facie unreasonable and must be justified by their proponents." FMC Op., 23 Shipping Reg. (P & F) at 988. Furthermore, in providing its justification, the Port Authority must meet a two-part standard: "whether [its] decision was reasonable at the time it was made and, even if so, whether it was still reasonable in light of its subsequent effects." Id. (citing Agreement No. T-2598, 17 F.M.C. 286, 295 (1974)). Viewed from either perspective, the Commission concluded that the Port Authority offered sufficient justifications for its action.
 
 
 12
 Petchem petitions for review and asks this court to affirm the FMC's jurisdiction but to reverse on the merits. The Port Authority joined by Hvide, as intervenors, challenge the Commission's jurisdiction but support it on the merits.
 
 II. THE JURISDICTIONAL ISSUES
 
 13
 Intervenors challenge the Commission's jurisdiction on two grounds: first, they assert that towing activities are not subject to the Shipping Acts; and second, as cruise ships are not "common carriers" within the meaning of the Acts, jurisdiction over the CPA cannot be predicated on their use of its facilities. Brief for Intervenors on Lack of Jurisdiction at 6-7. The Commission argues that we should decline to decide the intervenors' jurisdictional challenges if we agree with the agency's conclusions on the merits. Brief for Respondents at 23-24 & n. 12 (citing, inter alia, Citizens for Allegan County, Inc. v. FPC, 414 F.2d 1125, 1134-35 (D.C.Cir.1969)).
 
 
 14
 Allegan County is almost exactly on point. There, the petitioner objected only to the Federal Power Commission's approval of a utility acquisition, not to its jurisdiction. The intervenor, a privately owned power company, raised a variety of jurisdictional objections to the agency's review of a power company's acquisition of a city-owned utility. The Federal Power Commission had upheld the acquisition, and we in turn upheld the agency on the merits. We acknowledged that we had "stepped over certain jurisdictional matters raised by intervenor at the threshold," 414 F.2d at 1134, because the jurisdictional issues were complex and not fully presented in the administrative record. Id. at 1134 n. 15.
 
 
 15
 The background of this case differs only slightly from Allegan County. Although several jurisdictional issues were raised before the FMC and decided in its opinion, the Commission explicitly left open an alternative ground for finding in personam jurisdiction based on the CPA's filed tariffs for cargo shipping. FMC Op., 23 Shipping Reg. (P & F) at 981-83. Furthermore, at oral argument the intervenors noted that the CPA's actions in its capacity as a terminal operator could be distinguished from its governmental actions as a port authority chartered by the State of Florida. Echoing the point made by Commissioner Moakley in his concurring opinion, they suggest that if the Port Authority were found to be "wearing its governmental hat" rather than its "terminal operator hat" when it granted Hvide's franchise, the FMC would not have jurisdiction to review its actions.
 
 
 16
 The jurisdictional issues raised in this case have significant implications, yet each is presented in a context that causes us to question whether this is the forum in which they should be decided. For example, the Canaveral Port Authority is vested with comprehensive responsibilities over every aspect of the Port and its operations. It is not clear from the record, however, in which capacity the CPA was acting when it decided that Hvide's exclusive franchise was necessary to assure the proper servicing of commercial shipping. Thus we are reluctant to determine whether, as Commissioner Moakley argues in his concurring opinion, the CPA's grant of a tugging franchise fits "neatly on the navigational side" of its responsibilities. FMC Op., 23 Shipping Reg. (P & F) at 996.
 
 
 17
 Similarly, this does not appear to be the appropriate case in which to decide the peripheral issue of whether cruise ships fall within the jurisdiction of the FMC. Such a ruling would have far-reaching consequences for the cruise ship industry, which is not a party to this action. That issue, on the other hand, is squarely addressed in another case that may soon be tried in this circuit, American Ass'n of Cruise Passengers v. Cunard Line, Ltd., Civ. No. 86-0571 (D.D.C. filed Feb. 27, 1987).
 
 
 18
 Given these circumstances, and given the fact that our own jurisdiction is not at issue, we think this an appropriate case "to invoke the doctrine under which ... a court may bypass a jurisdictional issue without decision and dispose of the case by a ruling on the merits." Allegan County, 414 F.2d at 1135 (footnote omitted).
 
 III. THE MERITS
 A. The Standard of Review
 
 19
 In reviewing the Commission's decision, we are bound by the "scope of review" provisions of the Administrative Procedures Act which, in relevant part, read as follows:
 
 
 20
 The reviewing court shall--
 
 
 21
 ....
 
 
 22
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
 
 
 23
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 
 
 24
 ....
 
 
 25
 (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute;
 
 
 26
 ....
 
 
 27
 5 U.S.C. Sec. 706. Thus we must uphold the FMC's decision if supported by substantial evidence. Dart Containerline Co. v. FMC, 639 F.2d 808, 813 (D.C.Cir.1981).
 
 
 28
 In its review of the ALJ's initial decision, the Commission "has all the powers which it would have in making the initial decision." 5 U.S.C. Sec. 557(b) (1982). The ALJ's decision is no more than a recommendation that the Commission is free to reject. Alcoa S.S. Co. v. FMC, 321 F.2d 756, 758-59 n. 5 (D.C.Cir.1963). Although the ALJ's "initial findings are not immaterial," our principal concern is the evidentiary support for the decision of the final authority. Dart Containerline, 639 F.2d at 813. Substantial evidence may exist to support both the agency's final decision and a contrary initial decision. Id. at 814 (citing Williams v. Bell, 587 F.2d 1240, 1246-47 (D.C.Cir.1978)).
 
 
 29
 Petchem argues that the FMC's decision can be supported by substantial evidence and yet remain arbitrary, capricious, or otherwise not in accordance with law. It asserts that in such circumstances we are bound by the latter standard, which it describes as requiring a high degree of deference to an agency's decision. Brief for Petitioner at 32-33. In Association of Data Processing Service Orgs., Inc. v. Board of Governors of the Federal Reserve System, 745 F.2d 677, 683-84 (D.C.Cir.1984), then-Judge Scalia noted that
 
 
 30
 [t]he "scope of review" provisions of the [Administrative Procedures Act], 5 U.S.C. Sec. 706(2), are cumulative. Thus, an agency action which is supported by the required substantial evidence may in another regard be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"--for example, because it is an abrupt and unexplained departure from agency precedent.
 
 
 31
 Id. at 683 (footnote omitted). The court had to decide whether a factual determination was to be reviewed under the arbitrary and capricious test of paragraph (A) of subsection 706(2), or under the substantial evidence test of paragraph (E). The court made it clear that it is the substantial evidence test that applies to formal agency proceedings. 745 F.2d at 683-84.
 
 
 32
 As we review factual determinations made by the FMC after a formal hearing, we must apply the substantial evidence test established in paragraph (E). If, in applying the law to those facts, the agency appears to have engaged in an "abrupt and unexplained departure" from its own precedent, we will apply the arbitrary and capricious test.
 
 B. The Burden of Proof
 
 33
 Relying on what it described as "a synthesis of the St. Philip and Agreement No. T-2598 [, 17 F.M.C. 286 (1974) ] decisions," the Commission set forth the following analysis:
 
 
 34
 [Exclusive] arrangements are generally undesirable and, in the absence of justification by their proponents, may be unlawful under the Shipping Acts. However, in certain circumstances, such arrangements may be necessary to provide adequate and consistent service to a port's carriers or shippers, to insure attractive prices for such services and generally to advance the port's economic well-being. The burden of adducing evidence of such circumstances falls upon the port and the other parties to the exclusive arrangement, both because they are the arrangement's proponents and because evidence of that nature usually lies within their control. Nevertheless, the ultimate burden of proof in any Shipping Act challenge to an exclusive terminal arrangement or franchise rests with the party wishing to overturn the franchise.
 
 
 35
 FMC Op., 23 Shipping Reg. (P & F) at 990.
 
 
 36
 Petchem objects that the Commission's analysis notwithstanding, St. Philip and Agreement No. T-2598 are incapable of synthesis because the latter represents, in its view, a sharp and unexplained departure from longstanding FMC precedent as set forth in Stockton Port and St. Philip. As Petchem summarizes the applicable precedent, exclusive tug arrangements are "so inherently repugnant to the equitable and pro-competitive norms of section 16 of the [1916] Act that the agency has bluntly labeled these practices to be prima facie unjust." Brief for Petitioner at 36. Therefore, the CPA's " 'burden of sustaining such practices as just and reasonable is a heavy one,' " Reply Brief for Petitioner at 7 (quoting Stockton Port and St. Philip ).
 
 
 37
 Thus Petchem implies, based on these cases, a far more stringent standard than the Commission in fact applied in this case. We believe, however, that the differences between those cases and the instant one are more tonal than substantive, and we find the changes evolutionary rather than "abrupt and unexplained." While the Commission described the exclusive arrangement in St. Philip as "prima facie unjust and unreasonable," and stated that "unless justified, the arrangement must be struck down," 13 F.M.C. at 173, it nonetheless implied that exclusive arrangements could be justified. Moreover, it indicated the grounds on which this could be done by noting that the respondents in that case had failed to make "any attempt to justify the exclusionary arrangement as being necessary to the operation of the terminal." Id.
 
 
 38
 Nor would a stringent standard be consistent with the statutory language. Section 16 of the 1916 Act forbids only "undue or unreasonable preference" and "undue or unreasonable prejudice." 46 U.S.C. app. Sec. 815 (First) (1982 & Supp. I 1983) (emphasis added); see Stockton Port, 7 F.M.C. at 84 (interpreting section 17). The Act clearly contemplates the existence of permissible preferences or prejudices. The analogues in the 1984 Act contain similar modifying adjectives, see 46 U.S.C. app. Sec. 1709(b)(11)-(12) & (d)(1) (Supp. II 1984).
 
 
 39
 Even though the Shipping Acts disfavor exclusive arrangements, they allow the FMC flexibility in applying the antidiscrimination provisions in light of the particular circumstances existing at a given port. This flexibility is served by a rule that, in the first instance, holds restrictive port service arrangements to be presumptively illegal, but allows the proponents to meet the presumption of illegality through the offer of evidence in support of the restrictive arrangement's reasonableness. If, however, such a demonstration is made, the challenging party has, in the Commission's words, the "ultimate burden" of establishing that the justifications fall short of what the law requires.
 
 
 40
 C. Analysis of the FMC's Decision on the Merits
 
 
 41
 After reviewing the ALJ's conclusions as well as the extensive evidentiary record, the FMC found that the Port Authority's denial of Petchem's application was justified both at the time its decision to deny was made and at the time of the Commission's review.
 
 
 42
 The FMC based its finding on the following factors, among others. At the time Petchem's application was denied, the company had had no prior towing experience and had not yet begun work under its military contract; the contract required Petchem to respond to military requests within thirty minutes, yet it would have only two tugs with which to service both military and commercial shipping; and Hvide, which had agreed to continue its commercial towing work even though it foresaw substantial initial losses, had demonstrated its ability to do the commercial work.
 
 
 43
 The Commission noted that although the CPA expected the demand for commercial towing to increase, the introduction of competition could cause Hvide to withdraw from the Port. This would jeopardize the Port's ability to assure reliable, competent towing services to its increasingly important commercial users. Under the circumstances, the FMC concluded that the Port Authority's continuance of Hvide as exclusive provider of commercial towing services was justified at the time Petchem's application was denied. FMC Op., 23 Shipping Reg. (P & F) at 990-91.
 
 
 44
 The Commission then considered developments since the denial of the application. It noted that although Petchem had proven itself a competent operator, there was little evidence that it could handle more than its military business. In fact, in 1984, it was required to call upon Hvide for assistance on eight occasions. By the same token, although there had been an increase in commercial work at the Port, Hvide's continuing losses demonstrated both that there was not yet enough commercial business to profitably support one tugboat operation, let alone two, and that the Port Authority was justified in crediting Hvide's statements that it would withdraw from the Port if competition were permitted. Yet if Hvide were to cease its commercial operations, there was no evidence that Petchem could fill the gap and provide the continuous, dependable commercial tugging service the Port required. Id. at 993-94.
 
 
 45
 Based on "[t]he preponderance of the evidence of record," the Commission concluded that it "should not disturb the present division of tug markets at the Port." Id. at 994. At the same time, it observed that continued growth and other changes at Port Canaveral might require a different conclusion in the future, and it recommended that the CPA consider competitive biddings at a later date. Id. at 994-95.
 
 
 46
 Petchem objects that the Commission's conclusions are either unsupported by the record or contrary to law. Petchem first attacks the FMC's assertion that the CPA properly questioned Petchem's ability and readiness to perform commercial services. Petchem, however, offers nothing concrete to rebut the Port Authority's reasons, recited above, for declining to grant the non-exclusive franchise in the first instance. Nor does it explain why we may ignore the Commission's determination, at the time of its review, that although Petchem had performed well in meeting the military's tug requirements, it was not then able, with just two tugs, to step into the breach and serve Port Canaveral's commercial shipping needs in the event Hvide withdrew its tugboats.
 
 
 47
 Although Petchem chastises the FMC for its noncritical acceptance of the large losses reflected in Hvide's financial statements, it does not assert that Hvide was operating at other than a loss. Nor does Petchem refute the ample third-party evidence describing the extent to which Hvide would be damaged by the loss of even a small percentage of its existing work at Port Canaveral.
 
 
 48
 We have rejected, in our discussion of the burden of proof, Petchem's argument that the Commission's past interpretations of the Shipping Acts forbid exclusive franchises of the kind granted to Hvide. Petchem advances, however, the ALJ's alternative argument that "[e]ven assuming, arguendo, that only one commercial tug service was viable within the Port and that a franchise agreement was necessary--why did the Port not allow any tug service to become the franchise [sic]? Why did it select and foster [Hvide]?" ALJ Op., 23 Shipping Reg. (P & F) at 496. The suggestion that the franchise should have been submitted for competitive bidding ignores the realities of this case. As the FMC noted, no other tug operator had expressed an interest in providing services for commercial vessels at Port Canaveral. FMC Op., 23 Shipping Reg. (P & F) at 992. Furthermore, if the franchise had been opened to bidding and Petchem had proven to be the only bidder in addition to Hvide, the Port Authority would still have had to consider the relative reliability of the two companies because of the Authority's overriding responsibility for the efficient operation of the Port.
 
 
 49
 The focus of Petchem's next attack is on the FMC's statement that
 
 
 50
 reduced to its essentials, [the Port Authority's denial of Petchem's application] represented a conclusion that the creation of the "set aside" program of a monopoly for Petchem over military work necessitated the creation of a balancing monopoly for Hvide over commercial work.
 
 
 51
 Id. at 991. Although Petchem would have us find a sinister significance in the FMC's use of the phrase "balancing monopoly," in context it is quite benign. The Commission's next sentence reads as follows:
 
 
 52
 By denying Petchem's application, the Port Authority gave Petchem some time to establish itself and also gave itself some time to gain a better understanding of how the new division of military tug work from commercial work would affect Petchem, Hvide, Port Canaveral and the carriers and shippers using the Port.
 
 
 53
 Id. (footnote omitted). The Commission was not condoning a regime of permanent, parallel monopolies. Rather, it viewed the decision to deny the application as dictated by temporary considerations of prudence.
 
 
 54
 Were there any doubt as to the Commission's understanding of the basic objectives of the Shipping Acts, it has been put to rest by its observation that "even if the Port Authority continues to believe that an exclusive franchise for commercial work is necessary, it should consider carefully whether periodic competitive bidding for that franchise would be beneficial." Id. at 995. As Petchem grows in experience, there is no reason to believe the company may not in time qualify to be among the bidders. Although the Commission describes these comments as advisory, they confirm that it fully recognizes that the Shipping Acts do not favor exclusive arrangements except in special circumstances.
 
 IV. CONCLUSION
 
 55
 As the FMC's findings are supported by substantial evidence, and its conclusions are neither arbitrary, capricious, nor contrary to law, the petition for review is
 
 
 56
 Denied.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 292(a) (1982)