**CITY OF SOMERVILLE, City of New Waverly and Office of Public Utility Counsel, Appellants,**

v.

**PUBLIC UTILITY COMMISSION, Gulf States Utilities Company and Texas Industrial Energy Consumers, Appellees.**

No. 3–92–456–CV.

Court of Appeals of Texas, Austin.

Nov. 3, 1993.

Order Withdrawing Judgment and Dismissing Cause Dec. 8, 1993.

Rehearing Overruled Dec. 22, 1993.

Jim Boyle, Boyle, Freeman & Bender, Austin, for Cities of Somerville and New Waverly/cross appellees.

Stephen Fogel, William L. Magness, Office of Public Utility Counsel, Austin, for Office of Public Utility Counsel/cross appellee.

David C. Duggins, Amanda Foote, Clark, Thomas, Winters & Newton, Austin, for Gulf States Utilities Co./cross appellant.

Dan Morales, Atty. Gen., Susan D. Bergen, Asst. Atty. Gen., Austin, for Public Utility Comm'n of Texas/cross appellant.

Frederick D. Junkin, Mayor, Day, Caldwell & Keeton, L.L.P., Houston, for Texas Industrial Energy Consumers.

Before POWERS, KIDD and B.A. SMITH, JJ.

KIDD, Justice.

This appeal arises from a suit for judicial review of an order issued by the Public Utility Commission of Texas (the "Commission") granting Gulf States Utility Company ("Gulf States") an increase in its retail electric rates. The Cities of Somerville and New Waverly (the "Cities") and the Office of the Public Utility Counsel ("OPUC") brought suit in district court seeking judicial review of the Commission's order. The district court affirmed the Commission order in large part, but remanded the case to the Commission on various federal income tax questions. We will affirm the district court's action on the tax questions, but reverse the affirmance of the Commission's adoption of the non-unanimous settlement stipulation ("NUS") and render judgment that that portion of the Commission order be reversed and the cause remanded to the Commission for action consistent with this opinion.

## PROCEDURAL BACKGROUND

This case originated in 1989 when Gulf States filed an application with the Commission seeking an $88 million increase in retail electric rates. The Commission styled Gulf State's application as docket number 8702 and conducted an extensive evidentiary hearing on the application before several Commission administrative law judges.[1] Following the conclusion of these hearings, the hearing examiners assigned to this case issued a 213–page examiner's report summarizing the evidence and testimony presented during the hearing and recommended a retail electric rate increase of approximately $9 million. The examiners later modified this recommendation and proposed a larger rate increase of $14 million.

After the examiner's report was issued, all but two of the parties involved in the case initiated extensive settlement negotiations in order to resolve the case before it was submitted to the Commission for final disposition on the merits. OPUC and the City of Somerville did not participate in these negotiations.[2] The parties to the settlement negotiations eventually agreed to a $30 million rate increase and submitted their proposed resolution of the case to the Commission in the form of an NUS.

After notice to all parties, on March 20, 1991, the Commission held a hearing on the NUS submitted by the settling parties. During this hearing, the Commission allowed OPUC and the City of Somerville to present objections to the NUS. Following this hearing, the Commission issued a final order, dated March 22, 1991, approving rates consistent with the NUS.[3] OPUC and the Cities subsequently brought a suit for judicial review pursuant to section 69 of the Public Utility Regulatory Act ("PURA")[4] and the Administrative Procedure Act ("APA").[5] The district court overruled all of the points of error presented except for those points attacking the federal income tax expense figure adopted by the Commission. Accordingly, the district court reversed the Commission's final order and remanded the case to the Commission with instructions that it recalculate the federal tax expense figure.

## DISCUSSION

1. **The Non–Unanimous Settlement Stipulation**

■ OPUC's sole point of error and the Cities' seven points of error essentially address the role of the NUS in the Commis-

---

1. This hearing encompassed 51 days of testimony between September 5, 1989, and December 18, 1990.

2. The City of New Waverly participated in the settlement negotiations, but withdrew its support for the settlement proposal after the Commission issued its initial final order on March 22, 1991.

3. Following motions for rehearing, the Commission issued a second final order, dated May 2, 1991, which did not significantly depart from the substance of the first order.

4. Tex.Rev.Civ.Stat.Ann. art. 1446c (West Supp. 1993).

5. The Administrative Procedure and Texas Register Act is nonsubstantively codified in the Government Code and renamed the Administrative Procedure Act. Act of May 4, 1993, 73d Leg., R.S., ch. 268, sec. 1, §§ 2001.001–.902, 1993 Tex.Sess.Law Serv. 587, 737–54 (to be codified as Administrative Procedure Act, Tex.Gov't Code Ann. § 2001.001–.902) (effective Sept. 1, 1993).

sion's decision of this cause. The crux of the Cities' position in their first six points of error is that it is *never* permissible for the Commission to base its decision in a rate case, in part, on an NUS. Thus, the Cities argue that the Commission's use of the NUS in this case was arbitrary and capricious. We disagree. In previous cases we have held that the Commission may base its final order, in part, on an NUS, provided certain conditions are met. *See City of El Paso v. Public Util. Comm'n,* 839 S.W.2d 895, 903 (Tex.App.—Austin 1992, writ granted); *see also Cities of Abilene v. Public Util. Comm'n,* 854 S.W.2d 932, 937–40 (Tex.App.—Austin 1993, writ requested). Accordingly, we overrule the Cities' first six points of error to the extent that they contend that a Commission decision based, in part, on an NUS is never proper.

We will now consider the Cities' final point of error and OPUC's sole point of error, both of which question the sufficiency of the factual findings issued with the Commission's final order. OPUC, while recognizing that an NUS is permissible, contends that these findings of fact are not sufficient to determine whether the use of an NUS *in this case* complied with the requirements we set out in *City of El Paso.* OPUC argues that the Commission's findings of fact neither explain the basis for the Commission's final order, nor are sufficient to determine whether the final order is supported by substantial evidence in the record. We agree.

In *City of El Paso,* we set out two requirements that the Commission must meet in order to consider an NUS as part of its final order. First, the Commission must afford any non-stipulating party the opportunity to be heard on the merits of the stipulation. *City of El Paso,* 839 S.W.2d at 903. Second, the Commission must make an independent finding, on the merits, that the terms of the stipulation are fair, just and reasonable, *and*

*are supported by evidence in the record. Id.* This second requirement reflects the rule that an agency's decision, whether or not based on an NUS, must be supported by substantial evidence.[6] APA § 2001.-174(2)(E); *see also Texas State Bd. of Dental Examiners v. Sizemore,* 759 S.W.2d 114, 116 (Tex.1988), *cert. denied,* 490 U.S. 1080, 109 S.Ct. 2100, 104 L.Ed.2d 662 (1980). We believe that the Commission complied with the first requirement by allowing OPUC and the Cities' the opportunity to present arguments against the stipulation during the May 1991 hearing. However, we do not believe that the findings of fact incorporated in the Commission's final order are sufficient to determine whether the order is supported by substantial evidence in the record and, therefore, we conclude that the Commission's final order does not meet the second requirement of *City of El Paso.*

Section 2001.141(b) of the APA requires an administrative agency to issue findings of fact and conclusions of law with every final decision.[7] Although the APA does not delineate standards for judging the sufficiency of the findings required under section 2001.141(b), effective judicial review of an agency's decision requires at least a *minimal level* of factual findings in order for a reviewing court to determine whether the agency's decision has support in the evidence. While there is no precise form for an agency's articulation of underlying facts, these findings should be sufficient to serve the purpose for requiring factual findings, which is to inform the parties and the courts of the basis for the agency's decision so that the parties may intelligently prepare an appeal and so that the courts may properly exercise their function of judicial review. *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 451–52 (Tex.1984). *See generally* John Powers, *Judicial Review*

---

6. The requirement that there be evidentiary support for the Commission's decision is equally applicable in the case of an NUS because the Commission's resolution of the case must be on the merits. "[E]ven if there is a lack of unanimity [in the stipulation], it may be adopted as a resolution *on the merits.*" *Placid Oil Co. v. FPC,* 483 F.2d 880, 893 (5th Cir.1973) (emphasis in original).

7. The relevant text of APA § 2001.141(b) states, "A decision that may become final under Section 2001.144 must include findings of fact and conclusions of law, separately stated." A.P.A. § 2001.141(b).

*of the Findings of Fact Made by Texas Administrative Agencies in Contested Cases*, 16 Tex.Tech.L.Rev. 475, 479–83 (1985). The Commission's factual findings, therefore, should be treated as "more than a technical prerequisite." *Charter Medical–Dallas*, 665 S.W.2d at 451.

▮ Furthermore, requiring the Commission to issue sufficient factual findings to allow for proper judicial review is especially important in cases where the Commission's decision is based, as in this case, on an NUS. As we recognized in *Cities of Abilene*, there is a significant temptation for the Commission to merely adopt an NUS without requiring the utility to meet its burden of proof.[8] *Cities of Abilene*, 854 S.W.2d at 938–39. Therefore, in *City of El Paso*, we emphasized that when the Commission bases its final decision on an NUS, it must resolve the case *on the merits* and make an *independent* finding that the resolution of the case is "fair, just and reasonable." *City of El Paso*, 839 S.W.2d at 903. Otherwise, by merely adopting the terms and proposed factual findings contained in the NUS without considering the merits of the case, the Commission would be abdicating its statutory responsibility to decide the controversy.[9] In *City of El Paso*, we concluded that the Commission's resolution of the case on the merits was supported by substantial evidence in the record. In *City of El Paso*, the Commission held extensive evidentiary hearings which resulted in the issuance of an examiner's report containing evidentiary summaries and proposed factual findings. In its final order, the Commission adopted 237 findings of fact consistent with the NUS submitted in that case. The findings of fact set forth the basis of the Commission's decision.[10] Accordingly, we concluded that the Commission independently had resolved the case on the merits and that the Commission's resolution was supported by substantial evidence. *City of El Paso*, 839 S.W.2d at 903–04.

▮ In the present case, however, we hold that the Commission's final order does not contain the minimum level of factual findings necessary to determine whether the Commission's resolution of the case is supported by substantial evidence.[11] The Commission's factual findings are deficient because they exclude critical underlying variables that allegedly support the Commission's decision to grant Gulf States a $30 million rate-base increase.[12] This $30 million figure should be based on an intricate and complex series of underlying calculations and schedules which, when linked, comprise the analytical basis justifying a rate increase. While we recognize that a reviewing court may not possess the technical expertise to fully assess the analysis supporting a rate increase, a reviewing court must at least be provided with basic factual findings by the Commission to determine whether the rate increase approved by the Commission has evidentiary support. For example, in the present case, the Commission's findings of fact do not include the basic rate of return that Gulf States was allowed.[13] Nor do the findings adopted by the Commission detail the underlying variables used to calculate Gulf States' retail base-rate electric revenue requirement and the resulting increase in retail base

---

8. *Cities of Abilene* addressed the concern that the adoption of an NUS might raise a due-process problem by unintentionally shifting the burden of proof from the utility to the opponents of the NUS. *Cities of Abilene*, 854 S.W.2d at 938–39.

9. The text of PURA states: "It shall be the duty of the regulatory authority to insure that every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable." PURA § 38.

10. The Commission's factual findings also included references to attached schedules detailing the underlying variables supporting the rate-base increase approved by the Commission.

11. The examiner's report issued in this case contained 234 findings of fact. The Commission's final order adopted 72 findings of fact.

12. In its final order the Commission declared that it was "not endorsing or approving any ratemaking principle or method underlying the [NUS] Joint Recommendation."

13. The rate of return, when multiplied by a utility's total invested capital, yields the return that the utility is allowed on its assets. This variable is added to operating costs, tax costs and other expenses to calculate the utility's revenue requirement, which is a critical factor in determining the amount of the rate-base increase.

rates.[14] Thus, in contrast to the findings involved in *City of El Paso*, the factual findings in this case fail to provide sufficient factual support for the rate increase approved by the Commission in order to allow a reviewing court to determine whether the increase has support in the hearing transcripts or the examiner's report.[15]

Our basic disagreement with the dissenting opinion is its identical treatment of all settlement agreements, be they *unanimous* or *non-unanimous*. To paraphrase one of our great historical documents—all settlement agreements are *not* created equal. The dissent argues that once a utility gets a *sole*[16] contestant to agree with its position and enters into an NUS, then all of the contested-case procedures and substantive guarantees of PURA are no longer required. The dissent states: "Typically the settling parties relinquish, expressly or by necessary implication, many if not all the procedural formalities and safeguards that are incidental to formal adjudications." Opinion at 569. Query: What about the rights of the nonsettling parties? Do they forfeit their rights to a contested-case hearing and a fair and just adjudication of the case by the Commission as a result of *some* of the contesting parties agreeing to settle? The dissent's view of things is that once *some* of the contestants agree to settle, the Commission is no longer required to even file findings of fact and conclusions of law giving the basis for the Commission's decision. Further, according to the dissent, the nonsettling parties are left to challenge the NUS solely on the basis that the Commission somehow abused its discretion in approving the NUS. As a practical matter, the end result of the dissent's suggested *informal procedure* emasculates the rights of the *nonsettling parties* to challenge by any meaningful procedure the rate increase provided for in the NUS. Finally, the dissent's suggested *informal procedure* would virtually eliminate judicial review of Commission decisions. As we read the dissenting opinion, the Commission can approve the NUS without the necessity of a hearing and most importantly, without justifying its decision with the introduction of any evidence supporting the proposed rate increase. Thus, not only is the Commission relieved of its obligation to justify its decision by the filing of findings of underlying facts, but also that decision does not even need to be based upon substantial evidence in the record. This approach violates the precepts this Court set forth in *City of El Paso* for Commission approval of an NUS and effectively deprives the nonsettling parties of all rights before the Commission because of the existence of an NUS entered into by *some* of the parties to the dispute. We suggest that the procedure put forward by the dissent is not workable when the agreement is not *unanimous*.

Our decision today is not meant to impede or retard the use of settlement agreements, be they unanimous or non-unanimous, to resolve disputes before the Commission. On the contrary, we regard the settlement of these complex, expensive, and often time-consuming cases at the Commission level to be a worthwhile goal. As a consequence, we do not seek to dictate the particular form that the Commission's findings of fact must take; nor do we prescribe the particular findings of fact that are necessary to uphold the Commission's order. *See Goeke v. Hous-*

---

**14.** The Commission's finding of fact number 10 states:

> The Commission finds rates consistent with the [NUS] filed on March 20, 1991, to be reasonable and in the public interest and that the reasonable and necessary Texas retail base rate electric revenue requirement of Gulf States is $449,546,125. This revenue requirement represents a $30 million increase in Texas retail base rates.

**15.** The Commission's final order did not include schedules or other calculations supporting the $30 million rate-base increase.

**16.** It is true that in this case the vast majority of contesting parties agreed to the NUS. However, the rule contended for by the dissent makes *no* distinction whether a minority or majority of the contestants agree to settle. Furthermore, it is noteworthy that one of the nonsettling parties was OPUC whose public duty is to represent residential and small commercial ratepayers before the Commission. The dissent continually refers to this NUS as an "agreed settlement" between the *essential parties* to the case. Surely, the dissent does not suggest that OPUC's presence is *non-essential* or irrelevant to the disposition of this contested-case.

ton *Lighting & Power Co.*, 797 S.W.2d 12, 15 (Tex.1990); *State Banking Bd. v. Allied Bank Marble Falls*, 748 S.W.2d 447, 448–49 (Tex.1988).

In *Goeke*, the Commission denied the application by Houston Lighting and Power Company ("HL & P") to amend its certificate of convenience and necessity in order to construct new high voltage transmission lines. The Commission's decision turned on its conclusion that HL & P had failed to prove that the need for the new lines outweighed the detrimental impact of the project. The supreme court ruled that the Commission's final order contained findings of fact sufficient to allow a reviewing court to conduct a proper review of the Commission's decision. *Goeke*, 797 S.W.2d at 14. In its decision, the court cited specific factual findings which, it concluded, supported the Commission's finding that HL & P had failed to meet its burden of proof. *Id.*

In the present case, however, the Commission's abbreviated findings of fact do not include the elements necessary to review the Commission's decision, since the key variables and assumptions supporting this decision are missing. We conclude, therefore, that the factual findings supporting the Commission's final order in the present case were insufficient to permit proper judicial review of the Commission's final order, especially since the final order was based, in part, on an NUS. Accordingly, we sustain OPUC's sole point of error and the Cities' seventh and final point of error.

**2. Federal Income Tax Expense Calculations**

■■■ Gulf States and the Commission assert two points of error contending that the district court erred in holding that the Commission improperly calculated Gulf States' federal income tax expenses. The district court concluded that the Commission's calculation of Gulf States' federal income tax expenses excluded tax deductions that the utili-

ty received on capital expenditures that the Commission had previously disallowed on a showing that Gulf States had not proven their prudence.[17] Applying the "actual taxes paid doctrine" articulated in *Public Utility Commission v. Houston Lighting & Power Co.*, 748 S.W.2d 439 (Tex.1987) and *Public Utility Commission v. GTE–SW*, 833 S.W.2d 153 (Tex.App.—Austin 1992, writ granted), the district court ruled that these deductions must be used to reduce Gulf States' federal income tax expense for rate-making purposes. According to the actual taxes paid doctrine, a utility is entitled to rates "based only on the tax expense that had been actually incurred." *Houston Lighting & Power*, 748 S.W.2d at 442. Thus, any tax savings that a utility receives must be included in its federal income tax expense calculations for rate-making purposes, even when the tax savings arises from disallowed expenses. Gulf States and the Commission attempt to distinguish these prior cases by arguing that the disallowed expenses in those cases involved *non-capital* expenses while in the present case the disallowed expenses are *capital* expenses. Accordingly, Gulf States and the Commission contend that deductions for disallowed *capital* expenses should not be subject to the actual taxes paid doctrine. We disagree.

The underlying principle guiding the supreme court in *Houston Lighting & Power* was that tax savings actually enjoyed by the utility "should inure to the benefit of the ratepayers." 748 S.W.2d at 422. Consequently, a utility's federal income tax expenses for rate-making purposes should take into account tax savings on all deductible expenses, whether the Commission allows or disallows those expenses. *GTE–SW*, 833 S.W.2d at 169. We believe that this principle reflects a policy judgment that the ratepayers should not be required to pay for disallowed expenses, either directly or indirectly. Section 41(c)(3) of PURA provides that the Commission should not consider disallowed expenses in assessing a utility's revenue re-

---

17. These disallowed expenses arose from the utility's River Bend Nuclear Plant project. In an earlier rate case, the Commission concluded that Gulf States had not met its burden of proving that $1.4 billion of the project's costs were pru-

dent and, consequently, disallowed those expenditures for rate-making purposes. *See Coalition of Cities for Affordable Util. Rates v. Public Util. Comm'n*, 798 S.W.2d 560 (Tex.1990).

quirement.[18] However, if disallowed but deductible expenses are not considered in calculating a utility's federal income tax expense for rate-making purposes, the ratepayers will *indirectly* incur a percentage of those disallowed expenses equal to the utility's federal income tax rate.

Gulf States and the Commission contend that subjecting disallowed capital expenses to the actual taxes paid doctrine would violate the "normalization" requirement of the Internal Revenue Code. The Internal Revenue Code allows a utility to depreciate its capital assets on an accelerated basis while calculating its income tax expenses for rate-making purposes on a straight-line basis. Consequently, in the initial period that the utility depreciates an asset, ratepayers will pay a higher level of income tax expenses than the utility actually pays. In later periods, however, the income tax expenses calculated for rate-making purposes will be less than those actually paid. Thus, normalization is a process for allocating the burdens and benefits of federal taxes and deductions over the life of the asset.[19] Gulf States and the Commission contend that requiring them to pass the tax savings of disallowed capital expenses to ratepayers would violate normalization requirements and prevent the utility from depreciating its capital assets on an accelerated basis. We disagree with this argument.

In *GTE–SW*, we rejected GTE's contention that the actual taxes paid doctrine would violate normalization requirements. 833 S.W.2d at 166–67. Normalization concerns the allocation of tax savings from *allowable* expenses. Under normalization, the ratepayers never pay more income tax expenses than those tax expenses actually incurred by the utility over time. Income tax expenses higher than those actually incurred by the utility during the early life of an asset are eventually offset in later periods by income tax expenses that are lower than those actu-

ally paid. *Id.* This spreading of allowable expenses, however, is far different than calculating tax expenses for rate-making purposes by *pretending* that the disallowed expenses are not going to be deducted from the actual federal taxes paid by the utility. As a consequence, we see no reason in the present case to depart from our conclusion in *GTE–SW* that the actual taxes paid doctrine does not violate normalization requirements, even if the tax savings at issue arise from disallowed capital, as opposed to non-capital, expenditures. Accordingly, we overrule all of Gulf States' and the Commission's points of error.

## CONCLUSION

We affirm that part of the district court's judgment remanding the case to the Commission on the federal income tax questions, but reverse the district court's affirmance of the Commission's order adopting the NUS, and render judgment that that portion of the Commission order be reversed and the cause remanded to the Commission generally for action consistent with this opinion.

POWERS, Justice, dissenting.

I respectfully disagree with the majority decision. I would affirm the agency order in its entirety.

## THE COMMISSION'S FINAL ORDER

Gulf States applied to the Commission for authority to alter the rates and charges reflected in its tariffs on file with the agency. Thereafter, the cause proceeded in the ordinary course of contested-case litigation under the formalities established in the Administrative Procedure Act. Act of May 4, 1993, 73d Leg., R.S., ch. 268, sec. 1, §§ 2001.141–.178, 1993 Tex.Sess.Law Serv. 587, 737–54 (West) (to be codified as Administrative Procedure Act, Tex.Gov't Code.Ann. §§ 2001.001–.902) (APA).[1] The parties continued in dispute

18. PURA § 41(c)(3).

19. *See generally* Elizabeth Warren, *Tax Accounting in Regulated Industries: Limitations on Rate Base Exclusions*, 31 Rutgers L.Rev. 187, 187–94 (1978).

1. Effective September 1, 1993, the Administrative Procedure and Texas Register Act (APTRA) is

nonsubstantively codified into the Government Code and renamed the Administrative Procedure Act. Act of May 4, 1993, 73rd Leg., R.S., ch. 268, §§ 47, 49, 1993 Tex.Sess.Law Serv. 587, 988–89 (West).

through a final evidentiary hearing before the Commission's examiner. After the close of the evidence and legal argument, the examiner prepared and served a proposal for decision as required by APA section 2001.-062. The proposal included findings of fact and conclusions of law together with the examiner's reasons for her recommendations regarding the parties' various contentions.

After receiving the examiner's report, the parties entered into intensive negotiations toward an agreed settlement and compromise of the case. They kept the Commission informed as to their progress and positions on various issues. Finally, all the litigating parties save two entered into a written agreement of settlement and compromise they entitled a "Joint Recommendation," to become effective on the Commission's approval. The settling parties included the State of Texas, the Commission as a litigating party, Gulf States, and numerous cities that had been allowed to intervene in the contested case. The City of Somerville and the Office of Public Utility Counsel, both intervenors, objected to the agreement as a basis for the Commission's decision.

In a final order dated March 22, 1991, modified somewhat after motions for rehearing, the Commission granted in part and denied in part Gulf States' application "as recommended by the signatory parties to the Joint Recommendation and [as] supported by the record." In lieu of the examiner's proposed findings of fact and conclusions of law, the Commission substituted others attached to the agency's final order to reflect the settlement as the basis of the order, adopting only so much of the proposal for decision as was consistent with the final order.

The terms of the Commission's final order awarded Gulf States a $30 million increase in retail-base rates and approved tariffs filed by the utility on March 7, 1991. Under the Joint Recommendation, the Commission's approval bound Gulf States not to seek another rate increase for a two-year period, to make certain refunds to its customers, and to perform other undertakings that had been bargained for in arriving at the Joint Recommendation. In its final order, the Commission found that the $30 million increase in retail base rates resulted in rates that were "just and reasonable and in the public interest based on consideration of the merits of all issues raised in [the] proceeding." The Commission also declared, however, that the agency was not thereby "endorsing or approving any ratemaking principle or method underlying the Joint Recommendation." [2]

---

**2.** The Commission must fix rates that are "just and reasonable," not "unreasonably preferential, prejudicial, or discriminatory, but ... sufficient, equitable, and consistent in application to each class of consumers." Public Utility Regulatory Act, Tex.Rev.Civ.Stat.Ann. art. 1446c, § 38 (West Supp.1993) (PURA). The terms of PURA establish the basic framework for ratemaking in the Commission; these statutory terms have been refined and interpreted in various agency rules and in judicial decisions. The ultimate objective is to fix the utility's "overall revenues at a level which will permit such utility a reasonable opportunity to earn a *reasonable return* on its *invested capital* used and useful in rendering service to the public over and above its *reasonable and necessary operating expenses.*" PURA § 39(a) (emphasis added).

In succeeding provisions of PURA, the legislature has specified the factors applicable to the Commission's calculation of "reasonable and necessary operating expenses," "invested capital," and "rate of return." Before these ultimate sums may be calculated, and utility rates fixed therefrom, the Commission may have to resolve by fact findings any number of purely factual or mixed legal and factual disputes the parties may

have with regard to the various factors listed in PURA sections 39(b), 41, and 41B. In arriving at a reasonable return on invested capital, for example, the Commission may have to make fact findings relative to the following factors: "[I]n addition to other applicable factors, [the utility's] efforts to comply with the statewide energy plan, the efforts and achievements of such utility in the conservation of resources, the quality of the utility's services, the efficiency of the utility's operations, and the quality of the utility's management." PURA § 39(b). The calculation of a reasonable rate of return will also require fact findings to resolve any dispute about the cost of each component of the utility's capital structure—debt, preferred stock, and common stock—and what is necessary to maintaining the soundness of that structure. *See generally* Joe S. Poff, *Determination of the Allowable Rate of Return by the Texas Public Utility Commission,* 57 Tex. L.Rev. 289 (1979).

In determining the utility's "invested capital," the legislature has specified that the Commission must calculate the figure based on the following factors: the original cost of the utility's properties "used and useful ... in providing service including construction work in progress at cost

## FACT FINDING REQUIREMENTS IN AGENCY DECISIONS BASED ON AGREED SETTLEMENTS

The majority reject the various points of error in which the City of Somerville contends the Commission may not base its final decision on a settlement agreement that is less than unanimous. I concur in this and find no merit in any of the City's other points of error. The majority sustain, however, the points of error brought by the City and the Office of Public Utility Counsel wherein they complain that the Commission's final order violates APA sections 2001.141(b) and (d) because the findings of fact and conclusions of law that accompany the agency order are inadequate. I dissent from this part of the majority decision.

### The Majority Holding and Rationale

In APA sections 2001.141(b) and (d), the legislature required that an agency's final decision include the following: (1) "findings of fact and conclusions of law, separately stated"; and (2) "a concise and explicit statement of underlying facts" that support any findings "expressed in statutory language." One of the *purposes* of this requirement is to allow a meaningful judicial review of the factual grounds of the agency decision without the court's improper intrusion into matters reserved for agency discretion. The sole *function* of a fact finding, however, is the resolution of a factual dispute. It has no other function. *See generally* John Powers,

*Judicial Review of the Findings of Fact Made by Texas Administrative Agencies in Contested Cases*, 16 Tex.Tech L.Rev. 475, 479–83 (1985).

The Commission's final order includes the agency's conclusions of law stated separately from its findings of ultimate fact and findings of underlying fact. These are consistent with and support a Commission decision based upon the parties' Joint Recommendation or settlement agreement, which is the true basis of decision in the contested case.

The majority hold the findings of fact insufficient, however, because they fail to include the numerous fact findings the Commission *would* have been required to make *if* the case had *not* been settled. At least, that is how I understand the majority opinion.

"The Commission's factual findings are deficient," the majority say,

> because they exclude *critical underlying variables* which allegedly support the Commission's decision to grant Gulf States a $30 million [base rate] increase. This $30 million figure *should* be based on an intricate and complex series of *underlying calculations and schedules* which, when linked, comprise the analytical basis justifying a rate increase.

(Emphasis added). The references to "critical underlying variables" and "underlying calculations and schedules" can only mean, it seems to me, the large number of calculations and related findings of fact the Com-

---

as recorded on the books of the utility"; and whether inclusion of construction work in progress "is necessary to the financial integrity of the utility"; whether the construction work in progress has been "inefficiently or imprudently planned or managed," and to what extent. Each of these will of course require supporting fact findings to the extent they are disputed. PURA § 41(a).

The possible fact findings required in disputes about "reasonable and necessary operating expenses" are almost numberless in the abstract. They will, however, ordinarily fall into seven categories: (1) operations and maintenance expense incurred in furnishing normal utility plant service; (2) depreciation expense; (3) assessments and taxes other than income taxes; (4) federal income taxes on a normalized basis; (5) advertising, contributions, and donations; (6) nuclear decommissioning expense; (7) and accruals credited to reserve accounts for a self-

insurance plan; excluding however any sums not actually incurred and any self-insurance plan. The calculations must exclude any sums not actually incurred and any amounts incurred contrary to the public interest or for fines, civil penalties, or lobbying expenses. If any expenses were paid to an affiliate of the utility, a special set of findings relating to those sums is necessary before "reasonable and necessary operating expenses" may be calculated. *See generally* Ron Moss, *Ratemaking in the Public Utility Commission of Texas*, 44 Baylor L.Rev. 825 (1992).

In sum, the Commission in fixing rates under PURA may have to make many hundreds of decisions to resolve factual and mixed legal and factual *disputes*. Each such decision will require a fact finding that declares what the Commission has decided. Must the Commission make the findings in the *absence* of a dispute among the essential parties? That is, indeed, the majority theory.

mission must make in disputed cases relative to the many factors involved in fixing the utility's "overall revenues at a level which will permit such utility a reasonable opportunity to earn a *reasonable* return on its *invested capital* used and useful in rendering service to the public over and above its *reasonable and necessary operating expenses.*" PURA § 39(a) (emphasis added). As an example, the majority point out that the Commission's findings "do not include the basic rate of return that Gulf States was allowed." A reasonable rate of return on invested capital cannot be calculated until the Commission has first made findings on the several factors required by PURA to be determined in making that calculation, as I have previously outlined. *Supra* note 2. "Nor do the findings adopted by the Commission detail the underlying variables used to calculate Gulf States' retail base rate electric revenue requirement and the resulting increase in retail base rates," state the majority. Of course, Gulf States' revenue requirement could not be fixed, as PURA section 39(a) requires, until the Commission had determined the utility's reasonable and necessary operating expenses as discussed previously, with attendant findings of fact in a number equal to the range of possible disputes about all the relevant factors that enter into the calculation of such expenses. *Id.*

In summary, it appears to me that the majority hold that APA section 2001.141(a) and (b) requires the same kind of fact findings (1) *irrespective* of the fact that the parties are *not in dispute* about the issues to which those fact findings might refer, (2) *irrespective* of the fact that the parties have asked the agency to render a decision based on their agreement *in lieu of* the facts about which they formerly disputed, and (3) *irrespective* of the fact that the agency finds that a decision based on their agreement is in the public interest and *actually* decides the case on that basis. I believe the majority holding is erroneous. It is based on a misunderstanding of the sole function of fact findings, *which is to resolve disputed fact issues.*

On a purely practical basis, the majority's holding disregards our previous interpretation of the identical statutory language. In *State Banking Board v. Valley National Bank,* 604 S.W.2d 415, 419 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.), we construed section 16 of the repealed Texas Administrative Procedure and Texas Register Act, Tex. Rev.Civ.Stat.Ann. art. 6252–13a (currently APA section 2001.141(b)) to mean that the agency need not set out in its order fact findings that it did not actually make and did not actually rely upon in making its decision. More importantly, the majority's holding has erected an insurmountable barrier to the agencies' disposition of contested cases, the great bulk of which must of necessity be disposed of informally. Fact findings require evidence, evidence requires hearings, and hearings require lawyers, witnesses, argument, and agency decisions about the facts proper to be inferred from conflicting evidence. Under the majority's holding, the expense of a contested case thus becomes about the same whether the case is settled or not. Moreover, findings as to the "variables" are subject to substantial-evidence review under the majority's holding. The majority holding thereby negates the two major incentives by which parties are led to the negotiation table and to an accord—saving the expense and avoiding the uncertainty of continued litigation.

Influenced by the majority holding, moreover, the agencies will in the future tend to deny intervention to parties having less than a due-process right to appear in the contested case, for each prospective intervenor represents an additional risk of a party who might "torpedo a fair and reasonable settlement as to all who have the most direct and immediate interest" in the litigation. *Arctic Slope Regional Corp. v. Federal Energy Regulatory Comm'n,* 832 F.2d 158, 167 (D.C.Cir. 1987). Intervenors often serve a useful purpose in agency litigation; we should not discourage the agencies' exercise of discretion in favor of intervention.

Finally, I do not believe the agencies will be able to operate under the norm established in the majority's holding, which requires that at least the "critical underlying variables" be found by the agencies and expressed in their final orders as "findings of fact." For example, how shall an agency know what "underlying variables" the courts

consider "critical" among all the various, *interdependent* fact findings that are possible. *Supra* note 2. How shall the agency make bona fide fact findings when the case is settled before an evidentiary hearing takes place?

What the law requires in cases like the present is, I believe, quite different. I will discuss the matter at length because it is unexamined in the Texas cases so far as I can determine.

### Contested–Case Settlements and Judicial Review of Agency Decisions Based Thereon

The terms of the APA govern the Commission's disposition of "contested cases," a term that refers to agency proceedings "in which the legal rights, duties, or privileges of a party are to be determined by an agency after an opportunity for adjudicative hearing." APA § 2001.003(1). Under the APA, administrative agencies are authorized to dispose of a contested case, in whole or in part, and in either of two ways—formally or informally. These two ways are fundamentally different.

*Formal adjudications* are more familiar to practitioners and courts because they frequently result in judicial review under sections 2001.171–.178 and 2001.901 of the APA and, in such adjudications, the agency decides the case in a manner familiar to courts and practitioners. The agency (1) receives and weighs evidence together with any matter of which it takes official notice, (2) infers from such evidence a set of underlying facts according to a preponderance of the evidence, (3) infers or not, as the case may be, a set of ultimate facts, frequently expressed in

statutory language, and (4) from the ultimate facts arrives at a final decision by applying the statutory criteria. *See* 2 Frank E. Cooper, *State Administrative Law 466* (1965).

In APA sections 2001.141–.147, the legislature imposed upon the foregoing process certain formalities intended as procedural safeguards against unfairness. These include notice to parties of any hearing, evidentiary hearings, rules of evidence, discovery of evidence, final decisions based on evidence and matters officially noticed, and motions for rehearing. APA §§ 2001.051–.052, .141(a)–(d), .081, .091–.093, .145–.146. One important formality or safeguard is the one in dispute in the present appeal—the requirement that the agency decision include a statement of the fact findings and conclusions of law from which the agency purportedly derived its decision according to the law and the facts, as stated in APA section 2001.141(b).

Contested-case decisions are "formal adjudications" to the extent they require and conform to the statutory formalities. Formal adjudications account for only a small fraction of total agency adjudications.

*Informal adjudications* are less well-known. Nevertheless they "constitute the vast bulk of administrative adjudication and are truly the lifeblood of the administrative process." Senate Judiciary Comm., Administrative Procedure Act—Legislative History, S.Doc. No. 248, 79th Cong., 2d Sess. 35 (1945). Agency adjudications are "informal" to the extent they are decided without the formalities characteristic of formal adjudication. *See* Kenneth C. Davis, *Administrative Law Text*, Ch. 4, "Informal Action; Discretionary Justice," 88–122 (3d ed. 1972).[3]

---

**3.** The federal Administrative Procedure Act provides that an agency must "give all interested parties opportunity for ... offers of settlement," with resort to formal hearing procedures and decisions "to the extent that the parties are unable so to determine a controversy by consent." 5 U.S.C. § 554(c)(1), (2)(1988). In reference to this statute, it was said as follows:

[E]ven where formal hearing and decision procedures are available to parties, the agencies and parties are authorized to undertake the informal settlement of cases in whole or in part before undertaking the more formal hearing procedure. Even courts through pretrial

proceedings dispose of much of their business in that fashion. *There is much more reason to do so in the administrative process, for informal procedures constitute the vast bulk of administrative adjudication and are truly the lifeblood of the Administrative process....* It should be noted that the precise nature of informal procedures is left to development by the agencies themselves.

Senate Judiciary Comm., Administrative Procedure Act—Legislative History, S.Doc. No. 248, 79th Cong., 2d Sess. 203 (1945) (emphasis added).

Under the federal Administrative Procedure Act, it is even possible that an agency may abuse its

Mindful of the practical necessity of the agencies being authorized to decide contested cases informally, the legislature expressly authorized what might otherwise have been imputed to the APA under the rule of necessity: "Unless precluded by law, informal disposition may be made of any contested case by stipulation, agreed settlement, consent order, or default." APA § 2001.056. Each of the four kinds of "informal disposition" refers to something different. "Stipulation" refers to an agreement between disputing parties that removes from dispute some element of the contested case. An "agreed settlement" refers to a contract between the parties that determines the contested case in its entirety on its becoming operative with the agency's approval and adoption of the contract as a basis for the agency decision. A "consent order" refers to an agency decision that is both a contract between the parties and the agency's action taken thereon. A "default" refers to the legal fiction that a party has, by some failure to act in the case, conceded the material allegations involved, thereby justifying an agency action based on the default. In the present appeal, we have an "agreed settlement."

It is well-known, of course, that litigating parties often come to a settlement agreement after negotiation and adjustment of their respective contentions. This is no less true in the context of agency adjudications. The agreed settlement may be reached before the contested case is formally initiated, in the midst of the case, or after the close of evidence taken in a hearing after full compli-ance with all the formal requirements that attend a formal adjudication. The settlement may be based on terms, conditions, and calculations fashioned by the parties themselves from a variety of motives; perhaps the most common motives are avoiding the expense and uncertainty associated with formal adjudications.[4] Typically, the settling parties relinquish, expressly or by necessary implication, many if not all the procedural safeguards that are incidental to formal adjudications.

A reading of the APA reveals that the legislature, while it expressly authorized informal adjudications, omitted to prescribe any procedures to govern such adjudications. The omission was probably intentional, owing to the wide variety of agency proceedings to which the APA applies, any of which may result in informal disposition. In any case, the omission left such procedures to the agencies' discretion, subject to four basic restrictions: (1) the agency must have jurisdiction of the subject matter and the parties; (2) informal adjudication in the case is not precluded by law; (3) the essential parties actually consent to the terms of the agency decision; and (4) the agency determines that a decision based on the settlement agreement is in the public interest.

Concerning the matters set out in the foregoing summary, see the following authorities: 1 Frank E. Cooper, *supra* at 292–934; 3 Kenneth C. Davis, *Administrative Law Treatise* §§ 14.9, .10, .23, .24 (3d ed. 1980); 1 Charles H. Koch, Jr., *Administrative Law*

---

discretion if it refuses to afford the parties an opportunity to adjust and settle their differences. *See NLRB v. East Tex. Steel Castings Co.*, 211 F.2d 813, 816 (5th Cir.1954).

4. A passage in the court's opinion in *Pennsylvania Gas & Water Co. v. Federal Power Commission*, 463 F.2d 1242 (D.C.Cir.1972), is in structure:

It is well to note at the outset that "settlement" carries a different connotation in administrative law and practice from the meaning usually ascribed to settlement of civil actions in a court.... [I]n agency proceedings settlements are frequently suggested by some, but not necessarily all, of the parties; if on examination they are found equitable by the regulatory agency, then the terms of the settlement form the substance of an order binding on all the parties, even though not all are in accord as to the result. *This is in effect a "summary judgment" granted on "motion" by the litigants where there is no issue of fact.*
. . . .
Whether the summary action of any agency in a particular case is fair, just, equitable, and in accord with the procedure required by law is a matter for judicial review, as in the case at bar.
. . . .
"The whole purpose of the informal settlement provision is to eliminate the need for often costly and lengthy formal hearings in those cases where the parties are able to reach a result of their own which the appropriate agency finds compatible with the public interest." *Id.* at 1247.
*Id.* at 1245–47.

*and Practice* §§ 5.80–.83 (1985); Jacob A. Stein, *Administrative Law* § 33.05 (1991).

### Discussion

In the present case, the consenting parties compromised the whole of the controversy on terms satisfactory to themselves, as these were set out in their Joint Recommendation or agreed settlement. The consenting parties included most of the intervenors, the Commission as a party, the State of Texas, and Gulf States. The City of Somerville and the Office of Public Utility Counsel objected to the settlement. Nevertheless, the Commission acting as tribunal disposed of the contested case by accepting the terms of the agreed settlement after finding them to be in the public interest and a proper and sufficient basis for the agency's decision, holding that the resulting rates were "just and reasonable and in the public interest based on consideration of the merits of all issues raised in this proceeding."

It is not contended that informal disposition was precluded by law, that the Commission lacked jurisdiction, or that the consent of any of the settling parties was obtained by fraud, collusion, or mistake. Instead, the City of Somerville and the Office of Public Utility Counsel contend simply that the Commission's decision does not comply with APA section 2001.141(b) because the agency's final order does not include the agency's determinations, expressed as findings of fact, as to the many "variables" the agency *would* have decided by fact findings had the case *not* been settled. The majority adopt this view in their opinion and hold accordingly. I hold a contrary view.

I believe the findings of fact required by APA section 2001.141(b) must reflect the *true* basis of the agency decision—in this instance, a Commission decision based on the parties' Joint Recommendation or agreed settlement—as opposed to a *fictitious* basis, such as would be the case if the Commission had manufactured spurious fact findings while actually basing its decision on the agreed settlement. In my view, the findings mandated by APA section 2001.141(b), when the agency decision purports to rest on an agreed settlement, might refer to such remaining disputed

issues as whether the agency had subject-matter and personal jurisdiction of the consenting parties, whether informal disposition was precluded by law, whether the essential parties actually consented to the settlement, whether the disposition made of the case was in the public interest, and any other disputed issues of material fact not resolved in the agreed settlement expressly or by necessary implication.

The majority reject my views on two basic grounds. The first is their perception that my views entail an unfairness to the nonsettling parties—the City of Somerville and the Office of Public Utility Counsel in this appeal. "What about the rights of the nonsettling parties? Do they forfeit their rights to a contested-case hearing and a fair and just adjudication of the case by the Commission as a result of *some* of the contesting parties agreeing to settle?" I am not sure what the majority intend by their reference to the "rights" of the nonsettling parties "to a contested-case hearing." The word "rights" possibly refers to a nonsettling party's *substantive* rights in liberty and property. If that is the majority's intent, then I wholly agree that such a party must be allowed intervention in the contested case and any subsequent agency decision would have to be based on a settlement agreement to which he has consented. This would involve an issue of due process of law, and because such a person's joinder and consent would be essential, he must join in the settlement or no agency decision based thereon would bind him in his liberty or property interests. *See Railroad Comm'n v. Graford Oil Corp.,* 557 S.W.2d 946, 953–54 (Tex.1977). But the record does not indicate that the City of Somerville or the Office of Public Utility Counsel have or even claim a substantive right of that character. And the majority apparently do not refer to anyone's constitutional rights.

Rather, in assigning "rights" to the City and to the Office of Public Utility Counsel, the majority apparently refer to the procedural "rights" of parties in contested cases disposed of *formally,* as these are spelled out in APA sections 2001.141–.178. I have discussed these above. These are procedural rights given by the same statute that autho-

rizes informal disposition of contested cases. As to these "rights," I disagree that the nonsettling parties have a procedural right to all the incidents of formal adjudication when the Commission determines, as it did here, that all essential parties have settled the controversy, the public interest requires an agency decision based on that settlement, and the resulting rates are just and reasonable based on the whole record. It is an anomaly to contend that the nonsettling parties can hold the public interest hostage in such a case when they themselves have no substantive legal right, privilege, or interest that will be affected by the agency decision. *See Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 615 S.W.2d 947, 957 (Tex.Civ. App.—Austin), *writ ref'd n.r.e. per curiam,* 622 S.W.2d 82 (Tex.1981).

The majority reject my views on another ground. The majority believe my views would preclude meaningful judicial review of the Commission's decision. I disagree. It is readily evident that our different views in this regard result from an antecedent disagreement about the *scope* of judicial review when the contested case has been decided based on a settlement agreement. The majority reason as they do because they believe they must review the sufficiency of the evidence to support the numerous fact findings the Commission is supposed to make relative to all the "variables" involved in setting utility rates under PURA. *See supra* note 2. This is, of course, a necessary corollary to the majority's holding that such fact findings *are* required in *all* instances, *notwithstanding* that the agency decision rests on an agreed settlement in which all material facts have been removed from dispute.

I believe, on the other hand, that the scope of judicial review corresponds with the actual basis of the agency decision—an agreed settlement, in this instance, in which all elements of the controversy were removed from

dispute insofar as the settling parties were concerned, provided the Commission approved their agreement. The inquiry by a reviewing court is properly directed at whether the agency abused its discretion. This inquiry is determinable by the reviewing court in light of the record as a whole *including the nonunanimous settlement agreement and any arguments by the nonsettling parties directed at why the resulting order constitutes an abuse of discretion.* See APA § 2001.174(2)(F); *see also Mobil Oil Co. v. Federal Power Comm'n,* 417 U.S. 283, 312–14, 94 S.Ct. 2328, 2347–49, 41 L.Ed.2d 72 (1974); *New Orleans Pub. Serv., Inc. v. Federal Energy Regulatory Comm'n,* 659 F.2d 509, 511–14 (5th Cir.1981); *Pennsylvania Gas & Water Co. v. Federal Power Comm'n,* 463 F.2d 1242, 1245–52 (D.C.Cir.1972).[5]

In the present appeal, it is not contended that the Commission abused its discretion in the sense indicated, and I cannot see that the agency did so in light of the record as a whole.

### INCOME–TAX CALCULATIONS

I dissent as well from the majority's decision overruling the points of error urged by the Commission and Gulf States. They complain the trial court erroneously reversed the Commission's order and directed the agency to recalculate the income-tax expense component of Gulf States' operating expense. The parties apparently agree that the reversal rests on the ground that the hearing examiner, in her report to the Commission, expressly declined to follow the "actual taxes paid" rule established in *Public Utility Commission v. Houston Lighting & Power Co.,* 748 S.W.2d 439, 441–42 (Tex.1987), *cert. dismissed,* 488 U.S. 805, 109 S.Ct. 36, 102 L.Ed.2d 16 (1988). Had the Commission adopted that view and disregarded the supreme court's holding in *Houston Lighting,* in a case in which it properly applied, then

---

**5.** In *Mobil Oil Corp.,* the court declared the Federal Power Commission might adopt a nonunanimous settlement agreement in fixing rates, provided the agency (1) weighed the terms of the proposed settlement in light of the entire record; (2) made an independent finding, supported by substantial evidence in the record as a whole (including the settlement agreement), that the

resulting rates would be just and reasonable; and (3) approved the settlement as being in the public interest. *Mobil Oil Corp.,* 417 U.S. at 314, 94 S.Ct. at 2348. We adopted the same requirements in *City of El Paso v. Public Utility Commission,* 839 S.W.2d 895, 904 (Tex.App.—Austin 1992, writ granted).

there would, of course, be reversible error. The trial court was bound, however, as we are, to sustain the Commission's final order on any legal ground shown in the record. *Gulf Land Co. v. Atlantic Ref. Co.*, 134 Tex. 59, 131 S.W.2d 73, 84 (1939). The trial court erred, in my view, by failing to affirm the Commission's final order on that basis.

While the hearing examiner did expressly decline to follow the "actual taxes paid" rule, it is also true that the Commission itself expressly *declined* to adopt the examiner's view, her proposal for decision, her reasoning, and her suggested findings of fact and conclusions of law. The Commission promulgated instead its own findings of fact and conclusions of law and made a different decision based on the parties' settlement agreement or Joint Recommendation, adopting only so much of the examiner's proposals as were consistent with the agency's findings of fact, conclusions of law, and final decision. I cannot find that the $30 million retail base-rate increase results from anything apart from the reciprocal bargains set out in the parties' settlement agreement. In other words, it *does not* appear that the rate increase is a product of the hearing examiner's reasoning and recommended findings and conclusions regarding the calculations ordered in PURA section 41(c). Indeed, in ordering the rate increase based on the settlement agreement, the Commission expressly declared that it was "not endorsing or approving *any* ratemaking *principle* or *method* underlying the Joint Recommendation." (Emphasis added).

The Office of Public Utility Counsel and the City of Somerville have not shown that the Commission's final order results from an abuse of discretion or any other error listed in APA section 2001.174(2)(A)–(F). It appears to be only their assumption, not supported by the agency record, that the Commission adopted its examiner's income-tax calculation in arriving at the $30 million retail rate-base increase the agency ordered. To the contrary, the record indicates that the Commission's decision rests upon the parties' agreed settlement, considered in light of the public interest and whether the *settlement* would produce rates that are just and reasonable, based upon the record as a whole and quite irrespective of the examiner's rejected recommendations and reasoning.

While the case is not applicable here, I would again invite the supreme court to review the "actual taxes paid" rule established in *Houston Lighting. See Public Util. Comm'n v. GTE–SW*, 833 S.W.2d 153, 166 n. 11 (Tex.App.—Austin 1992, writ granted); Moss, *supra* note 2, at 833–36. It is a court-made rule that appears to be too broad, inflexible, and simplistic for the complex and even delicate task of ratemaking under PURA, and it appears to restrict unduly the discretion the legislature vested in the Commission to achieve just and reasonable rates (keeping in mind the competing interests of utility customers and the utilities themselves) in tandem with several other legislative objectives such as proper standards of service. *See, e.g.,* PURA § 41(c)(3)(D) (commission may promulgate rules with respect to allowance and disallowance of *any* expenses for ratemaking purposes); *Federal Power Comm'n v. United Gas Pipe Line Co.*, 386 U.S. 237, 246, 87 S.Ct. 1003, 1008, 18 L.Ed.2d 18 (1967) (when legislature "fails to provide a formula for the Commission to follow, courts are not warranted in rejecting the one which the Commission employs unless it plainly contravenes the statutory scheme of regulation."). I note that the legislature itself declined to impose as a general rule the "actual taxes paid" requirement in cases of consolidated tax returns; indeed, that body directed the use of an *imputed* or *hypothetical* income tax when that was shown to be advantageous and the utility failed to show that it was reasonable not to consolidate returns. *See* PURA § 41(c)(2).

I would affirm the agency order.

## PER CURIAM.

The parties have filed a joint motion to dismiss. The parties' joint motion is granted. Tex.R.App.P. 59(a).

The judgment of this Court, dated November 3, 1993, is hereby withdrawn and the judgment of the trial court is vacated and the cause dismissed in accord with the settlement agreement of the parties. The opinion

of this Court of November 3, 1993 is not withdrawn.